**Ann PRICE et al., Plaintiffs,**

v.

**COUNTY OF SAN DIEGO et al., Defendants.**

**Civil No. 94–1917–R (AJB).**

United States District Court, S.D. California.

Jan. 8, 1998.

Charles R. Woods, Trost, Street, Woods & Messina, San Diego, CA, for Plaintiffs.

John Sansone, County Counsel, County of San Diego, Diane Bardsley, Chief Deputy, Ricky R. Sanchez, Deputy, San Diego, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RHOADES, District Judge.

## I. Overview

Daniel Price died after San Diego County Sheriff's Department deputies forcibly restrained him. His family and estate then sued the deputies, then-Sheriff Jim Roache, and the county of San Diego. Plaintiffs allege causes of action for wrongful death, assault, battery, negligence, and violation of Price's civil rights.

The Court held a bench trial. After a lengthy trial and a careful review of the evidence, the Court hereby issues its findings of fact and conclusions of law in narrative form.[1]

## II. Background

On June 28, 1994 Daniel Price inspected a house that was for sale. Price, who had a history of chronic methamphetamine abuse, wore only shoes, socks, and shorts. Price did not seem to be intoxicated, but he was very animated, extremely demonstrative in his gestures, and spoke loudly. After touring the house, Price attempted to give his wallet to the occupant, Timothy Malone. Price then hugged Malone and departed. As Price walked away from the house, Malone saw him throw his appointment book and checkbook into some bushes.

Price then walked to a gate that led to the backyard of a nearby house, in which Christine Arrigo was sunbathing. After attempting to open the gate, Price made several unintelligible comments and departed.

Ms. Arrigo called 911, claiming that a man had thrown rocks at her windows. San Diego County Sheriff's Department deputies John Groff and Steven Clause arrived at the scene and contacted Price. Price told the deputies that he was fixing his truck and that he intended to go to a nearby house. The deputies allowed him to leave. Price then got into his truck and drove away—past the house to which he had told the deputies he was going. Although Price did not drive faster than thirty-five miles per hour, the deputies became suspicious and decided to contact him again.

The deputies stopped Price and asked him to exit his truck. Price did not comply and a violent scuffle, more properly characterized as a brawl, ensued. Witness Sandy Bias testified that Price was "resisting totally" and shouting at the deputies as they tried to calm him. Ms. Bias described Price as a man "going crazy," as if under the influence of drugs. Price knocked Deputy Groff's eyeglasses from his face, and the deputies be-

---

**1.** The Court has elected to issue its findings and conclusions in narrative form because a narrative format more fully explicates the reasons behind the Court's conclusions, which facilitates appellate review and provides the parties with more satisfying explanations.

However, Federal Rule of Civil Procedure 52(a) requires the Court to "find the facts specially and state separately its conclusions of law

...." Fed.R.Civ.P. 52(a). Nevertheless, it is "sufficient if the findings of fact and conclusions of law ... appear in an opinion ... filed by the court." *Id.* Accordingly, the Court has included an Appendix at the end of this Opinion that states separately its findings and conclusions. The Court incorporates the Appendix into this Opinion by reference.

lieved that Price was trying to grab their guns.

The deputies sprayed Price with small amounts of pepper spray and wrestled him to the ground. The deputies placed Price face-down and handcuffed him with his hands behind his back. Price continued to resist, struggle, yell, and kick at the deputies.

Deputies Sam Sheppard and Steven Tally then arrived. Because Price was kicking, Deputy Tally bound Price's legs together with leg shackles. Nevertheless, Price continued to kick at the deputies with both legs at once.

To control Price, the deputies held him down with their body weight and connected the leg shackles to the handcuffs with a second set of handcuffs. In other words, they bound his hands and legs together behind his back as he lay prone. This four-point restraint, or "hogtie," immobilized him.

The parties agree, and Plaintiffs' police-procedures expert confirmed, that the deputies used reasonable force up to the moment of the hogtie, and that it was proper to subdue Price with body weight. The parties also agree that applying the hogtie, in and of itself, was reasonable. Thus, the actions of the deputies up to the moment the hogtie was accomplished are not at issue, nor is their decision to use the hogtie restraint.

The issues in this case revolve around what happened next. As the deputies hog-tied Price, they necessarily applied some pressure to his torso. A deputy knelt next to Price and placed one knee on his back. The deputy also placed his hand on Price's shoulder. After the deputy completed the hogtie, he may have maintained pressure for a short time as he paused before rising from the ground.

Deputy Tally then knelt next to Price and placed one knee on his back. Deputy Tally rested most of his weight on his heels. Deputy Tally maintained contact in an effort to

calm Price and as a means of communicating his presence. Deputy Tally did not apply significant pressure to Price's torso.

At some point, Price began to smash his face into the ground repeatedly. In an effort to prevent Price from injuring himself, a deputy placed his foot on the back of Price's head and a kleenex box was placed underneath his face. Because of the blood on Price's face, the deputies called for medical assistance.

The deputies left Price lying shirtless on the hot asphalt for several minutes, despite a nearby shaded area. The asphalt temperature was approximately 133.9 degrees Fahrenheit. Although Deputy Tally was near Price after the hogtie was complete, the deputies did not monitor Price closely as he lay hogtied.

At some point, Price began turning blue, which suggests that he could not breathe properly.[2] As might be expected with such a dynamic and traumatic event, there is considerable variance in the testimony about when Price began to turn blue and how much time elapsed before the medics arrived.

Nevertheless, it appears that before the medics arrived, the deputies noticed Price turning blue.[3] However, they did not release him from the hogtie immediately, nor did they administer cardiopulmonary resuscitation ("CPR"), despite the fact that each of them had CPR training.[4]

The medics arrived within minutes, but by that time Price had no pulse and had stopped breathing. The medics administered CPR but to no avail. They then loaded Price into an ambulance and took him to the hospital. While in transit, the medics managed to restore Price's vital signs by administering "shots to the heart" and anti-narcotic medication. However, he did not regain consciousness.

---

**2.** Not all witnesses testified that Price turned blue. For example, one of the medics who responded did not see and did not note in his report that Price was blue. Another medic testified that Price was blue.

**3.** Although some evidence indicates that the deputies called for medics because of the change of color, the stronger evidence suggests that the

deputies called for medical assistance because of the blood on Price's face.

**4.** Testimony was not completely consistent about whether Price was still hogtied when the medics arrived. It appears that Deputy Tally was preparing to release Price and administer CPR when the medics arrived.

On June 30, 1994 Price died. A county medical examiner, John W. Eisele, M.D., conducted the autopsy. Dr. Eisele found low levels of methamphetamine in Price's system. He also found petichaie (pinpoint) hemorrhaging in Price's left eye, which suggests that Price's torso had been compressed.[5] Dr. Eisele listed the cause of death as "hypoxic encephalopathy due to restrictive asphyxia with cardiopulmonary arrest due to maximum restraint in a prone position by law enforcement." (Pls.' Ex. 12 at 1.) Dr. Eisele listed a contributing cause of death as "acute methamphetamine abuse." (*Id.*)[6]

Plaintiffs then sued the deputies, then-Sheriff Jim Roache, and the county of San Diego. Plaintiffs allege a cause of action against the deputies under 42 U.S.C. § 1983, for allegedly violating Price's Fourth and Fourteenth Amendment right to be free from excessive force.[7] Plaintiffs also allege state-law causes of action against the deputies for wrongful death, assault, battery, and negligence.

Plaintiffs have sued Defendant Roache under § 1983 for the actions of the deputies. Plaintiffs also have sued Defendant Roache under § 1983 for being deliberately indifferent to Price's civil rights. Additionally, Plaintiffs assert a negligence cause of action against Defendant Roache.

Plaintiffs next allege a cause of action under § 1983 against the county, relying on the theory of municipal liability articulated in *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs also seek to hold the county liable under the doctrine of respondeat superior.[8]

The Court will discuss each cause of action in turn.

### III. Discussion

#### A. The Claims Against The Deputies

##### 1. The § 1983 Claim

Plaintiffs have sued the deputies under § 1983, arguing that the deputies used excessive force on Price, in violation of the Fourth and Fourteenth Amendments. Plaintiffs allege that the hogtie, as applied in the unique circumstances of this case, constituted excessive force. Plaintiffs also allege that a deputy used unreasonable force when he placed his foot behind Price's head. Plaintiffs further claim that the deputies used excessive force by leaving Price prone on hot asphalt. Lastly, Plaintiffs argue that the failure to render CPR constituted excessive force.

 The Fourth Amendment governs the use of force. The Fourth Amendment requires peace officers to use only an amount of force that is objectively reasonable in light of all the surrounding circumstances. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Assessing the level of permissible force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests and the countervailing governmental interests at stake." *Id.* (internal quotation marks and citations omitted); *see also Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir.1994). Courts must give due regard to the fact that officers frequently make split-second judgments about the amount of force to use without the benefit of hindsight. *Graham,* 490 U.S. at 396–97.

---

**5.** One of Defendants' expert witnesses, Thomas Neuman, M.D., testified that numerous other factors can cause petichaie hemorrhaging, including problems that Mr. Price experienced while in the hospital. In addition, Dr. Eisele testified that heart failure, which Mr. Price experienced, can cause petichaie hemorrhaging.

**6.** Dr. Eisele testified at trial that the pepper spray did not contribute to Price's death. (Eisele Excerpt of Trial Tr. at 27.)

**7.** Section 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

**8.** Plaintiffs also sought to hold Defendant Roache liable under a respondeat superior theory. In addition, Plaintiffs alleged a cause of action under California Civil Code section 52.1. The Court granted summary judgment for Defendants on these claims on November 6, 1996.

With these principles in mind, the Court must determine whether the deputies acted reasonably with respect to each of the actions that Plaintiffs claim they took.

### a. The Hogtie Restraint

Plaintiffs argue that the hogtie restraint constituted excessive force because it is potentially lethal. Plaintiffs claim that the hogtie restraint can cause "positional asphyxia." Asphyxia is a decrease in blood oxygen levels or an increase in blood carbon dioxide levels—either of which can kill. (Eisele Excerpt of Trial Tr. at 16.) Positional asphyxia is asphyxia that results from body position.

Plaintiffs argue that positional asphyxia can occur when a hogtied person lies prone with pressure on his back. Plaintiffs claim that hogtying poses an especially great danger to large-bellied persons, such as Price. Plaintiffs claim that if the deputies had closely monitored Price and/or placed him on his side, then the hogtie's dangers would have been reduced or eliminated.

The Court first will discuss whether the hogtie restraint, in and of itself, constituted excessive force. The Court then will discuss whether the hogtie restraint constituted excessive force in light of Price's girth and the pressure on his torso.

### i. Whether The Hogtie Restraint Itself Constituted Excessive Force

Plaintiffs primarily rely on the testimony of Donald T. Reay, M.D., who first hypothesized the concept of positional asphyxia.[9] Dr. Reay conducted experiments and concluded that after exercise (such as a violent struggle with deputies) blood oxygen levels decrease. Dr. Reay found that the hogtie restraint prevents these oxygen levels from rising again because the hogtie restraint impairs the mechanical process of inhaling and

exhaling. *See* Donald T. Reay et al., *Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise,* 9 Am. J. Forensic Med. Pathology 16 (1988); Donald T. Reay et al., *Positional Asphyxia During Law Enforcement Transport,* 13 Am. J. Forensic Med. Pathology 90 (1992).[10]

Plaintiffs also rely on the testimony of Dr. Eisele. Dr. Eisele testified that Price experienced lactic acidosis. Lactic acidosis is a natural bodily reaction to exercise in which the body produces lactic acid. To compensate for the increased acidity of the blood, the body then produces extra carbon dioxide.

Dr. Eisele testified that because the hogtie restraint impairs the mechanical process of exhaling, it prevents the body from "blowing off" excess carbon dioxide. In other words, Dr. Eisele opined that Price suffered from asphyxia (an increase in carbon dioxide levels) that, because of the hogtie, Price's body could not correct.

Dr. Eisele based his opinions largely on Dr. Reay's work. In fact, it appears that every scientist who has sanctioned the idea that hogtying causes asphyxia has relied to some degree on Dr. Reay's studies. However, it appears that no scientist had ever critically examined Dr. Reay's methodology and logic—until recently.

After Price's death, at the request of defense counsel, Thomas Neuman, M.D., of the University of California at San Diego Medical Center ("UCSD") conducted a sophisticated study of positional asphyxia and the hogtie restraint.[11] Dr. Neuman found, contrary to Dr. Reay's findings, that blood oxygen levels do not decrease after exercise. Dr. Neuman also found that although the hogtie restraint impairs the mechanical pro-

**9.** Dr. Reay is the chief medical examiner for King County, Washington. He is board certified in anatomic, forensic, and clinical pathology.

**10.** Following Dr. Reay's studies, other scientists examined the subject of positional asphyxia. *See, e.g.,* C.S. Hirsh, *Restraint Asphyxiation,* 15 Am. J. Forensic Med. Pathology 266 (1994). These scientists generally agreed with Dr. Reay's hypothesis. Based on this storehouse of scientific theory, several law enforcement agencies, including the San Diego Police Department, either have banned hogtying or have trained their deputies to take precautions when applying the re-

straint. However, the vast majority of law enforcement agencies have not done likewise, nor has the California Commission on Peace Officers Standards and Training promulgated any training guidelines for using the hogtie restraint.

**11.** Dr. Neuman is a professor of medicine and surgery at UCSD. He is board certified in internal medicine, pulmonary disease, emergency medicine, and occupational medicine. He recently published his study. *See* Tom Neuman et al., *Restraint Position and Positional Asphyxia,* 30 Annals of Emergency Med. 578 (1997).

cess of inhaling and exhaling to an extent, the hogtie does not affect blood oxygen or carbon dioxide levels. In other words, the impairment is so minor that it does not lead to asphyxia, and in fact has no practical significance. Dr. Neuman explained the disparity between his findings and those of Dr. Reay by describing methodological flaws in Dr. Reay's experiments and logical flaws in Dr. Reay's reasoning.

The UCSD study, which Dr. Reay concedes rests on exemplary methodology, eviscerates Dr. Reay's conclusions. The UCSD study refutes Dr. Reay's underlying premise—that blood oxygen levels decrease after exercise. Thus, the UCSD study refutes Dr. Reay's ultimate conclusion—that the hogtie restraint prevents the lungs from replenishing the blood's oxygen supply; according to the UCSD study, the blood needs no replenishment after exercise because it already has adequate oxygen.

The UCSD study also refutes Dr. Eisele's opinion that the hogtie prevents the lungs from "blowing off" excess carbon dioxide. The UCSD study found no difference in carbon dioxide levels between subjects who had exercised and been hogtied, and subjects who had exercised and not been hogtied. Thus, as Dr. Neuman testified and Dr. Reay now concedes, the hogtie restraint is "physiologically neutral." (Reay Excerpt of Trial Tr. at 47.) [12]

After Dr. Reay's retraction, little evidence is left that suggests that the hogtie restraint can cause asphyxia. All of the scientists who have sanctioned the concept of positional asphyxia have relied to some degree on Dr. Reay's work. The UCSD study has proven Dr. Reay's work to be faulty, which impugns the scientific articles that followed it. Like a house of cards, the evidence for positional asphyxia has fallen completely.

 In light of the UCSD study, the hogtie restraint in and of itself does not constitute excessive force—when a violent individual has resisted less severe restraint techniques, applying a physiologically neutral restraint that will immobilize him is not excessive force. See Mayard v. Hopwood, 105 F.3d 1226, 1227–28 (8th Cir.1997) (holding that placing a person wearing handcuffs and leg restraints in a prone position was reasonable as a matter of law where the person had violently resisted arrest).[13]

### ii. Whether Price's Girth Made The Hogtie Particularly Dangerous For Him

 Plaintiffs press, however, that the hogtie *as applied to Price* posed a grave danger. Plaintiffs note that even the UCSD study found that hogtying impairs the mechanical process of breathing to a small extent. Plaintiffs argue that this impairment, combined with Price's girth, caused him to asphyxiate.

Plaintiffs have failed to prove this alleged fact. Plaintiffs have adduced no reliable evidence that suggests that Price's girth impaired his breathing. Dr. Reay opined that as Price lay prone, his belly may have applied pressure to his lungs, which could have impaired his breathing. However, Dr. Reay admitted that he has no empirical evidence that suggests that lying prone with a large belly can impair breathing to a significant extent. Thus, his testimony was wholly speculative.

---

**12.** The Court is aware that the UCSD study did not replicate the circumstances of Price's death perfectly. Numerous dissimilarities existed. For example, Dr. Neuman's subjects did not have methamphetamine in their systems, nor did they lie on hot asphalt. Plaintiffs argue that these differences mean that the UCSD study does not apply to Price.

This argument does not help Plaintiffs for several reasons. First, despite the differences, the UCSD study simply demonstrated basic physical principles—that the hogtie restraint, although it impairs breathing, does not affect blood gas levels. Second, the UCSD study at least has more applicability to Price than Dr. Reay's studies, which, by all accounts, are wholly flawed. Third, *no one knows* what effect factors such as methamphetamine would have on a hogtied person. Dr. Reay and Dr. Neuman merely testified that further study is needed. In light of this uncertainty, Plaintiffs have not established that factors such as methamphetamine made the hogtie particularly dangerous to Price.

**13.** Plaintiffs' argument that the deputies should have taken precautions because of the dangers of hogtying obviously fails. The UCSD study has shown the dangers to be fictitious, which obviates the need for precautions.

Moreover, Dr. Neuman studied individuals of Price's general size, shape, morphology, and body mass index. Dr. Neuman's study included persons with a body mass index of thirty, which is greater than Price's body mass index at the time of the struggle.[14] Dr. Neuman testified that although his study has limited applicability to extremely obese individuals, Price was merely somewhat over-weight. As Dr. Neuman testified, it is wild speculation to say that a person lying prone with a potbelly will asphyxiate to death while a slightly smaller person will have no physiological reaction whatsoever. Thus, the Court finds that Plaintiffs have not established that Price's girth made the hogtie especially dangerous for him.

### iii. Whether The Pressure The Deputies Applied To Price's Back Made The Hogtie Particularly Dangerous

■ Plaintiffs next argue that pressure on Price's back impaired his breathing. Plaintiffs argue that this pressure, combined with the breathing impairment caused by the hogtie, led to Price's death.[15]

Plaintiffs have failed to establish this alleged fact. Plaintiffs' witnesses produced wildly different accounts of the deputies' actions. Some witnesses claimed that the deputies "sat on" Price. Other witnesses did not recall seeing the deputies apply any pressure at all. Even those witnesses who testified that the deputies applied pressure provided different accounts about whether the deputies applied pressure before or after they applied the hogtie restraint.

The Court doubts that a deputy sat on Price, for three reasons. First, sitting on a hogtied person (whose hands and feet are necessarily above his torso) would be awkward indeed. Second, the deputies simply had no reason to sit on Price—the hogtie had immobilized him. It seems unlikely that a deputy would have sat in an awkward position for no reason. Third, Plaintiffs themselves have relentlessly claimed throughout this lawsuit that the deputies stood far away from Price after they hogtied him.

The deputies admit, however, that they applied minor pressure to Price's back. As they handcuffed and hogtied him, they necessarily had to control him from thrashing around, so a deputy placed a knee in Price's back and a hand on his shoulder. The Court finds that this action was reasonable. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir.1997) (holding on similar facts that "the officers' response was reasonable [inasmuch as the officers] placed just enough weight on [the arrestee] to keep him from rolling over and kicking"). A deputy testified that he may have maintained this pressure for a few seconds after he completed the hogtie as he got up from the ground. The Court holds that this innocent, brief action was reasonable.

In addition, Deputy Tally testified that he knelt next to Price, placing most of his weight on his heels. However, he placed a knee in Price's back. Deputy Tally did this to calm Price (and thus keep him from smashing his face into the ground) and to convey a sense of control in a tense, confused situation. Notably, Deputy Tally did not apply significant pressure to Price. The Court finds that Deputy Tally's actions were reasonable. *See id.*

Plaintiffs have not established that the deputies applied any more than the above-described pressure. Even if the deputies applied more pressure, Plaintiffs have not shown that the pressure impaired Price's breathing to a significant degree. Plaintiffs have not offered any evidence that indicates the *amount* of the pressure, nor have they

---

14. Plaintiffs note that Dr. Eisele calculated Price's body mass index as 30.001, which is outside the parameters of Dr. Neuman's study. This contention does not help Plaintiffs for two reasons. First, the difference is negligible. Second, Dr. Eisele calculated this body mass index during the autopsy, which was after Price took in fluids at the hospital. While in the hospital, Price took in approximately ten more liters of fluid than his body expelled. Because a liter of fluid weighs approximately 2.2 pounds, Price gained approximately 22 pounds while in the hospital, which dramatically increased his body mass index. Thus, when the deputies applied the hogtie, Price's body mass index was squarely within the parameters of the UCSD study.

15. Relying on Dr. Reay's studies, Plaintiffs initially argued that the hogtie alone caused Price's death. After the UCSD study came out, however, Plaintiffs began to argue that pressure on Price's back led to his death. Dr. Reay and Dr. Eisele both testified that pressure could have caused the death.

established what amount of pressure can impair breathing.[16]

Thus, Plaintiffs have failed to establish that any pressure that Price may have experienced impaired his breathing or affected his blood gas levels. In short, Plaintiffs have not proven that the hogtie as applied posed any danger to Price, or that it led to his death. Accordingly, the Court concludes that the deputies used reasonable force when they placed Price face-down and hogtied him, with incidental pressure applied to his torso. Insofar as the hogtie and pressure are concerned, Plaintiffs' excessive force claim fails.[17]

The obvious question remains, however: What *did* cause Price's death? The Court finds that, as several expert witnesses testified, he most likely died from a cardiac arrest that occurred during his encounter with the deputies.[18] Numerous factors indicate that methamphetamine-induced toxic delirium caused this cardiac arrest.[19] First, Price had methamphetamine in his system when Dr. Eisele conducted the autopsy, which means that he had recently used it.[20] Second, methamphetamine irritates the heart and makes it more prone to a cardiac arrest. (Eisele Excerpt of Trial Tr. at 25, 27.) Third, Price had "internal derangements" within his heart

that chronic methamphetamine abuse could have caused. (*Id.*) Fourth, methamphetamine can cause the body to release catecholamines (adrenaline) which also can irritate the heart. Dr. Eisele found catecholamines in Price's body. Fifth, Price had been acting in a bizarre fashion, which indicates that he was suffering from a methamphetamine-induced psychosis. (Neuman Excerpt of Trial Tr. at 34–35.) Sixth, Price developed a high fever at the hospital, which methamphetamine-induced toxic delirium frequently causes. (*Id.* at 36.) Seventh, while in the hospital, Price developed rhabdomyloysis, which is a breakdown of muscle cells. This is also a symptom of methamphetamine-induced toxic delirium.

Dr. Neuman perfectly captured the cause of death when he made the following statement:

> We have clear data that there is no respiratory component to the hogtie position. We also have clear data that Price was a chronic methamphetamine abuser. He had essentially all of the signs and symptoms of methamphetamine use, and he died a death that was completely consistent with toxic delirium secondary to methamphetamine use. To suppose anything

16. Each of the deputies weighed over two hundred pounds. Plaintiffs argue that this weight was more than sufficient to impair Price's breathing. However, this argument assumes that a deputy applied his full weight to Price. It seems entirely likely that as the deputy knelt next to Price and placed a knee in his back, he brought the bulk of his weight to bear on the knee that was on the ground, and applied only minor pressure to Price. Moreover, when Deputy Tally applied pressure to Price, he rested most of his weight on his heels.

17. The Court emphasizes the limited nature of its holding. The Court merely holds that on the particular facts of this case, the hogtie restraint did not constitute excessive force. Given the limitations of the UCSD study noted above, the Court intimates no view on whether the hogtie restraint might constitute unreasonable force if used on other individuals in other circumstances.

18. Expert witnesses testified that Price also experienced a pulmonary arrest. Although some experts expressed doubt about which type of arrest came first, Dr. Eisele and Dr. Neuman opined that the cardiac arrest came first. In fact, Dr. Eisele, who testified for Plaintiffs, specifically stated that the cardiac arrest led to the pulmo-

nary arrest. (Eisele Excerpt of Trial Tr. at 47–48.) Both of these doctors testified that they have no evidence that the hogtie restraint leads to cardiac arrests. This further indicates that the hogtie did not cause Price's death.

19. Dr. Neuman described toxic delirium as "a syndrome, [a] whole constellation of signs and symptoms seen in people who use methamphetamine. One aspect of the syndrome is delirium." (Neuman Excerpt of Trial Tr. at 35.)

20. Plaintiffs note that Dr. Eisele only discovered low levels of methamphetamine in Price's system. Plaintiffs argue that this means that methamphetamine did not kill Price. The Court rejects this argument for two reasons. First, the body metabolizes methamphetamine, so Price necessarily had more methamphetamine in his system at the time of the cardiac arrest than he did at the time of his death. Second, Dr. Neuman, who has had extensive experience with methamphetamine users, testified that "there is a very poor relationship between the blood levels of methamphetamine and whether or not you get into medical trouble from them." (Neuman Excerpt of Trial Tr. at 38.)

else placed a significant role in his death is speculation.

(*Id.* at 43.)

Moreover, Defendants' expert on methamphetamine abuse, Joseph Shannon, M.D., stated: "The only factor that can explain his death in and of itself was acute methamphetamine intoxication or excited delirium .... This is a highly lethal illness which may well have caused his death regardless of where he was, the restraints used or the struggle involved." (Shannon Excerpt of Trial Tr. at 7.) [21]

Thus, in the words of Dr. Neuman which the Court hereby adopts, "Mr. Price did not asphyxiate due to the hogtie position. Rather, the most obvious cause of death is toxic delirium secondary to methamphetamine abuse, which in turn caused Mr. Price to experience a cardiac arrest." (Neuman Decl. at 13.)

### b. The Foot On Price's Head

■ Plaintiffs next assert that a deputy used excessive force by placing his foot against the back of Price's head. Plaintiffs asserted during closing argument that the deputy did so for a malicious purpose.

Plaintiffs have offered no evidence to back up their assertion of maliciousness; indeed, all evidence points to the contrary. Price had been smashing his face into the asphalt repeatedly. The deputy testified that he placed his foot against Price's head in order to stop him from doing so. In fact, a deputy placed a kleenex box underneath Price's face in order to protect him further.

The Court has no reason to doubt this testimony. The Court finds that the deputy placed his foot against Price's head for a

patently reasonable, benevolent purpose. Thus, Plaintiffs' excessive force claim fails with respect to the foot on the back of Price's head.

### c. Leaving Price On Hot Asphalt

■ Plaintiffs next argue that the deputies used excessive force by leaving Price on the hot asphalt. The asphalt temperature was approximately 133.9 degrees Fahrenheit.

Although the Court does not suggest that leaving him lying on hot asphalt was ideal, the Court cannot find that this action was unreasonable. The struggle with Price had tired the deputies, which would have made it somewhat difficult to move a hefty, belligerent person. Moreover, the deputies had to perform other tasks, such as calling for medical assistance, controlling onlookers, and sundry other tasks that law enforcement work involves. The fact that the deputies did not move Price immediately is therefore understandable.

In addition, despite the high asphalt temperature, Price did not suffer any burns. Of course, the primary danger of leaving someone lying on hot asphalt is that the person might sustain burns. The fact that Price did not suffer burns indicates that the asphalt temperature was not so high that it was unreasonable to leave him lying on it for the short time that he did. Similarly, Plaintiffs have not established that the hot asphalt caused Price's death.

Thus, Plaintiffs' excessive force claim fails with respect to leaving Price on the asphalt.

### d. Failure To Administer CPR

■ Plaintiffs next argue that the deputies used excessive force by failing to give Price CPR after they noticed him turning blue.[22]

---

21. Dr. Shannon is a senior psychiatrist at a seven hundred patient drug rehabilitation center. The largest group of these patients have suffered from methamphetamine-induced psychoses. Dr. Shannon has also been a full-time faculty member at the University of California at Los Angeles School of Medicine, where he taught students about drugs and drug addiction.

22. It is somewhat awkward to conceptualize a failure to give medical aid as excessive force. *See Estate of Phillips*, 123 F.3d at 595. "[T]he duty to render medical aid is more often thought of as one arising under the Due Process Clause [of the Fourteenth Amendment] ...." *Id.; see also DeShaney v. Winnebago County Dep't of So-*

cial Servs., 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (stating that "when the State ... so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., ... medical care, ... it transgresses the substantive limits ... set by the Due Process Clause"). Nevertheless, the Supreme Court recently has held that "*all* claims that law enforcement officers have used excessive force ... in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. Because "the Fourth Amendment requires that seizures be reasonable under

Before the Court can reach the merits of this claim, the Court must determine whether the deputies are entitled to qualified immunity.[23] Qualified immunity protects government officials from lawsuits based on their conduct in situations in which they exercise discretion, insofar as their conduct does not violate clearly established rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects peace officers so that they "should not err always on the side of caution because they fear being sued." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (internal quotation marks and citation omitted).

The inquiry of whether the deputies are entitled to qualified immunity "begins with the question of whether the 'right the [deputies are] alleged to have violated [was] clearly established.'" *Mendoza,* 27 F.3d at 1360 (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). If the right was not clearly established, then the deputies are entitled to qualified immunity. *See Romero v. Kitsap County,* 931 F.2d 624, 629 (9th Cir.1991). In *Mendoza,* the Ninth Circuit provided guidance on how to determine whether a right is clearly established. The Ninth Circuit stated:

> The plaintiff's legal right cannot be so general so as to allow a plaintiff to "convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging [a] violation of extremely abstract rights." *Anderson,* 483 U.S. at 639.... For example, the Supreme Court in *Anderson* suggested that although "the right to due process of law is quite clearly established ... and thus there is a sense in which any action that violates [the Due Process Clause] (no matter how unclear it

may be that the particular action is a violation) violates a clearly established right," such a general allegation is not enough to overcome a defendant's qualified immunity. *Id.*

> For qualified immunity purposes, a right must [be] clearly established in a more particularized, and hence more relevant, sense ....

*Mendoza,* 27 F.3d at 1361 (internal quotation marks and citation omitted).

Thus, because Plaintiffs claim that the deputies violated Price's right to receive CPR from them, the issue becomes whether the deputies had a clearly established duty to administer CPR. *See Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1097 (6th Cir. 1992) (inquiring, for qualified immunity purposes, whether the officer had a clearly established duty to render medical aid).

The cases that have addressed this issue indicate that no such duty exists. In *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), a police officer shot a suspect. The police then summoned an ambulance, which took the suspect to a hospital. The Supreme Court held:

> The Due Process Clause ... require[s] the responsible government ... agency to provide medical care to persons ... who have been wounded while being apprehended by the police.... We need not define, in this case, [the city's] due process obligation to pretrial detainees or to other persons in its care who require medical attention. Whatever the standard may be, [the city] fulfilled its constitutional obligation by seeing that [the arrestee] was

all the circumstances, ... it would be objectively unreasonable in certain circumstances to deny needed medical attention to an individual placed in custody who cannot help himself." *Estate of Phillips,* 123 F.3d at 596.

It appears that a due process analysis applies after the initial "seizure" has ended but the individual remains in custody. *See id.* It is not always easy to determine when the seizure has ended. *See generally* Mitchell W. Karsch, Note, *Excessive Force and the Fourteenth Amendment: When Does Seizure End?,* 58 Fordham L.Rev. 823 (1990). In the present case, however, the seizure clearly had not ended. *See Graham,* 490 U.S. at

389–90 (using a Fourth Amendment analysis on similar facts); *Estate of Phillips,* 123 F.3d at 595–96 (same).

**23.** In its Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, the Court held that the deputies were not entitled to qualified immunity from Plaintiffs' excessive force claim. However, this holding rested on the possibility that the deputies may have acted unreasonably by applying the hogtie, applying pressure to Price's back, etc. The Court did not hold that the deputies were not entitled to qualified immunity with respect to the CPR issue alone.

taken promptly to a hospital that provided the treatment necessary for his injury.

*Id.* 463 U.S. at 244–45 (citations and footnote omitted). Thus, the Supreme Court suggested that a peace officer has no duty to provide medical care personally; rather, the Court suggested that an officer merely must summon medical aid.

The Ninth Circuit addressed a similar case in *Maddox v. City of Los Angeles*, 792 F.2d 1408 (9th Cir.1986). In *Maddox*, the defendant police officers placed an arrestee in a chokehold and then transported him to a hospital. When they arrived, they discovered that the subject did not have a pulse. Although each officer had CPR training, none administered CPR. Instead, they took the arrestee to the jail ward of the hospital where he received medical attention.

The trial court instructed the jury that "any failure by the officers themselves to render [CPR] is not a violation of the decedent's constitutional rights." *Id.* at 1414. Using a due process analysis, the Ninth Circuit upheld this instruction, stating that

> [t]he due process clause requires responsible governments and their agents to *secure* medical care for persons who have been injured while in police custody. We have found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances. Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either *promptly summoning the necessary medical help* or by taking the injured detainee to a hospital.

*Id.* at 1415 (emphasis added and citations omitted). Thus, the Ninth Circuit suggested that peace officers merely have a duty to summon medical aid, and need not personally administer CPR.[24]

The Tenth Circuit later considered *Maddox* in addressing a similar case. The Tenth

Circuit construed *Maddox* as "holding there is no duty to give, as well as summon, medical assistance, even if the police officers are trained in CPR." *Wilson v. Meeks*, 52 F.3d 1547, 1555 (10th Cir.1995). The Tenth Circuit followed *Maddox* and other cases to hold that "[t]he Constitution does not empower [courts] to command police officers to show compassion for those they injure in the line of duty.... To do [so] would undermine the policies of the qualified immunity doctrine." *Id.* at 1556.

The Eighth Circuit has reached a similar conclusion. In *Tagstrom v. Enockson*, 857 F.2d 502 (8th Cir.1988), the plaintiff led police officers on a motorcycle chase that ended when the plaintiff crashed into a tree, suffering severe injuries. The first officer to arrive on the scene immediately called an ambulance for the plaintiff but did not give him medical aid personally.

The Eighth Circuit stated:

> [The plaintiff] asks us to find that [the defendant police officer] had an affirmative duty to render medical assistance himself, such as giving ... CPR. However, [the plaintiff] points to no cases that clearly establish that [the officer] had such a duty. [Citing *Maddox*]. [The officer] properly performed his duty by immediately calling an ambulance. His decision not to give medical assistance ... did not violate [the plaintiff's] right to prompt medical assistance.

*Id.* at 504. Based on this reasoning, the Eighth Circuit held that the officer was entitled to qualified immunity.

None of the above cases used a Fourth Amendment "reasonableness" analysis. Nevertheless, they strongly suggest that the constitution does not impose a duty on peace officers to administer CPR personally. Plaintiffs have not cited, nor has the Court's independent research revealed, any case that has imposed such a duty on peace officers under any analysis.[25] Given this legal land-

---

24. This holding is perhaps limited by the Ninth Circuit's use of the phrase "any and all circumstances." This phrase seems to leave open the possibility that a duty to give CPR could arise in some circumstances. However, "[o]ne ambiguous bit of dictum in a Ninth Circuit opinion cannot form the basis for a 'clearly established'

and 'particularized' duty." *Wilson v. Meeks*, 52 F.3d 1547, 1555 (10th Cir.1995) (analyzing *Maddox*).

25. Even Plaintiffs' police-procedures expert testified that peace officers do not have a legal duty to administer CPR.

scape, even if such a duty exists, it certainly is not clearly established. Thus, the deputies are entitled to qualified immunity on the CPR issue. *See Romero,* 931 F.2d at 629 (holding that officers were entitled to qualified immunity because the right they allegedly violated was not clearly established).

### 2. The State–Law Claims

#### a. The Assault And Battery Claims

■ Plaintiffs next allege state-law causes of action for assault and battery. Defendants claim that they have immunity from these claims as well.

■ California Government Code section 820.2 provides immunity to peace officers for their discretionary acts in arrest situations. *See Reynolds v. County of San Diego,* 858 F.Supp. 1064, 1074 (S.D.Cal.1994), *aff'd in part and rev'd in part on other grounds,* 84 F.3d 1162 (9th Cir.1996); *Martinez v. County of Los Angeles,* 47 Cal. App.4th 334, 349, 54 Cal.Rptr.2d 772 (1996).[26] It does not confer immunity, however, if an officer uses unreasonable force. *Scruggs v. Haynes,* 252 Cal.App.2d 256, 266, 60 Cal. Rptr. 355 (1967).[27]

The Court already has found that the deputies used reasonable force by applying the hogtie restraint, applying pressure to Price's torso, leaving him on the asphalt, and placing a foot against his head. Thus, section 820.2 grants immunity to the deputies with respect to Plaintiffs' assault and battery claims, insofar as the claims derive from these actions.

However, the Court did not affirmatively find that the deputies acted reasonably when they failed to administer CPR. Rather, the Court merely found that they were entitled to qualified immunity. Section 820.2 will not confer immunity from Plaintiffs' state-law claims if the deputies' failure to provide CPR amounted to excessive force. *See Scruggs,* 252 Cal.App.2d at 266, 60 Cal.Rptr. 355.

■ Yet even assuming that the deputies' failure amounted to excessive force, any assault or battery claim that stems from their omission fails as a matter of law. A battery involves a touching. *See* Restatement (Second) of Torts § 18 (1965). An assault involves an apprehension of a touching. *Id.* § 21. A failure to provide CPR obviously involves neither a touching nor an apprehension thereof. Thus, Plaintiffs' causes of action for assault and battery fail.

#### b. The Wrongful Death Claim

Plaintiffs also have alleged a cause of action for wrongful death against the deputies.

■ Section 820.2 grants the deputies qualified immunity on the wrongful death claim unless they used excessive force. *See Reynolds,* 858 F.Supp. at 1074; *Martinez,* 47 Cal.App.4th at 349, 54 Cal.Rptr.2d 772; *Scruggs,* 252 Cal.App.2d at 266, 60 Cal.Rptr. 355. Thus, the deputies enjoy qualified immunity from the wrongful death claim, except perhaps insofar as the claim stems from the failure to provide CPR.

■ However, even assuming that the deputies used unreasonable force by not administering CPR, Plaintiffs' wrongful death claim still fails. To establish a wrongful death claim, Plaintiffs must prove that the deputies' failure to provide CPR *caused* Price's death. *See Jacoves v. United Merchandising Corp.,* 9 Cal.App.4th 88, 113, 11 Cal.Rptr.2d 468 (1992). Plaintiffs have not done so.

Plaintiffs presented the testimony of Janet Goldfarb, a registered nurse. Nurse Goldfarb testified that she has used CPR to revive patients and that she probably could have revived Price.

---

**26.** Section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2.

**27.** In its Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, the Court held that the deputies were not entitled to qualified immunity from suit because Plaintiffs had presented evidence that the deputies had used excessive force. The Court could not rule on whether the deputies had used excessive force at the summary judgment stage. Now that the trial has concluded, however, the Court has determined that the deputies did not use excessive force, and so can definitively determine whether the deputies are entitled to qualified immunity on Plaintiffs' state-law claims.

The Court cannot give too much weight to this testimony for several reasons. First, even if Nurse Goldfarb could have revived Price, that does not mean that the deputies could have done so. The deputies necessarily had far less medical training and experience than Nurse Goldfarb. Second, Nurse Goldfarb testified that she never has revived a person in cardiac arrest, as Price was. Third, it is unclear whether Nurse Goldfarb has ever administered CPR in the field, as opposed to a more sophisticated hospital setting.

Fourth, Dr. Neuman, who has vast experience in emergency room medicine, testified that "[p]eople with toxic delirium are most frequently not resuscitated." (Neuman Excerpt of Trial Tr. at 50.) He also testified that "[n]eurologically intact survival from cardiac arrest when CPR is given properly and promptly is in the neighborhood of a couple of percent." (*Id.* at 50–51.) This dismally low statistic strongly suggests that the failure to give CPR did not contribute to Price's death.[28]

Because Plaintiffs have not established that the deputies' failure to provide CPR caused Price's death, Plaintiffs' wrongful death claim fails.

### c. The Negligence Claim

Plaintiffs additionally have alleged a negligence cause of action against the deputies.[29]

■ To prevail on their negligence claim, Plaintiffs must show that the deputies acted unreasonably and that the unreasonable behavior harmed Price. *See Jacoves,* 9 Cal. App.4th at 113, 11 Cal.Rptr.2d 468. Except for the CPR issue, the Court already has found that the deputies acted reasonably. Thus, the negligence claim fails.

■ Insofar as the negligence claim stems from the failure to provide CPR, the claim fails on causation grounds for the reasons stated above.

### B. The Claims Against Defendant Roache

Plaintiffs also have asserted three causes of action against Defendant Roache. First, Plaintiffs have sued him under § 1983 for the actions of the deputies. Second, Plaintiffs have sued Defendant Roache under § 1983 for his alleged failure to train his deputies adequately. Third, Plaintiffs have sued him for negligence. The Court will discuss each of these claims in turn.

#### 1. The § 1983 Claim Based On The Actions Of The Deputies

■ To hold Defendant Roache liable for the constitutional violations of his subordinates, Plaintiffs must show that he either participated in or directed violations, or that he knew of violations and failed to act to prevent them. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

■ With respect to the CPR issue, even assuming that the failure to provide CPR amounted to a constitutional violation, Defendant Roache obviously did not participate in or direct the violation. Plaintiffs also have not proven that similar violations had occurred in the past, or that Defendant Roache knew about them and failed to prevent further violations.

With respect to the other actions of the deputies, the Court already has found that no constitutional violation occurred, so Plaintiffs cannot hold Defendant Roache liable for the actions of the deputies.

#### 2. The § 1983 Action For Failure To Train

■ Plaintiffs next invoke the principle that "a governmental officer may be held liable for damages for constitutional wrongs engendered by his failure to adequately supervise or train his subordinates." *Ting v. United States,* 927 F.2d 1504, 1512 (9th Cir. 1991). Insufficient training can form a basis

---

**28.** The medics managed to resuscitate Price after they loaded him into the ambulance. However, they did so using technologically advanced life-saving techniques, which are far different from the rudimentary CPR procedures the deputies could have used in the field. Thus, the fact that the medics managed to resuscitate Price does not mean that the deputies would have been able to do so.

**29.** Despite the qualified immunity conferred by California Government Code section 820.2, it appears that section 820.4 creates an exception for negligent acts. *See* Cal. Gov't Code § 820.4 (stating that "[a] public employee is not liable for his act or omission, exercising due care, in the execution of any law"); *Reynolds,* 858 F.Supp. at 1075 (finding that because an officer had exercised due care, "his conduct does not fall into the section 820.4 exception").

for liability under § 1983 if the failure to train amounts to deliberate indifference to the rights of people with whom peace officers may come into contact. *Id.*

 Plaintiffs note that Defendant Roache had a substantial amount of information prior to Price's death that indicated that hogtying poses grave dangers. Plaintiffs argue that by not acting on this information, Defendant Roache failed to train his deputies properly and that this failure amounted to deliberate indifference to the rights of Price.

This argument fails. Because the hogtie restraint did not inflict a constitutional injury on Price, § 1983 liability cannot attach. Moreover, Defendant Roache did not inadequately train his deputies about the dangers of hogtying; the UCSD study has shown these dangers to be fictitious. Defendant Roache cannot be liable for being deliberately indifferent to a nonexistent risk. Accordingly, Plaintiffs' § 1983 claim against Defendant Roache fails.

### 3. The Negligence Claim

 Plaintiffs next have sued Defendant Roache for negligence based on his failure to train his deputies about the dangers of hogtying. To establish a negligence claim, Plaintiffs must show that Defendant Roache acted unreasonably and that his unreasonable behavior caused Plaintiffs' harm. *Jacoves*, 9 Cal.App.4th at 113, 11 Cal.Rptr.2d 468.

Plaintiffs have not established either of these essential elements of a negligence claim. Defendant Roache did not act unreasonably by failing to alert his deputies to nonexistent dangers. Moreover, even if he acted unreasonably, Plaintiffs have not established that the hogtie caused Price's death. Plaintiffs' negligence claim therefore fails.

### C. The Claims Against The County

Plaintiffs also have alleged a § 1983 action against the county, relying on the theory of municipal liability articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs also seek to hold the county liable under the doctrine of respondeat superior. The Court will address each of these claims in turn.

### 1. The *Monell* Claim

 Under *Monell*, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [a constitutional] injury [then] the government as an entity is responsible under § 1983." *Id.* 436 U.S. at 694. In order to establish municipal liability, Plaintiffs must show that the county had a policy that exhibited deliberate indifference to the constitutional rights of the people with whom the deputies could come into contact, and that the policy was the "moving force" behind the constitutional violation in question. *City of Canton v. Harris*, 489 U.S. 378, 389–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir.1997).

 Plaintiffs claim that the Sheriff's Department's decision not to train its deputies in applying the hogtie restraint constituted a governmental policy or custom that inflicted constitutional injury on Price. Plaintiffs also have suggested that the Sheriff's Department had a custom or policy not to train its deputies to administer CPR.

These arguments fail. The hogtie restraint did not inflict a constitutional injury on Price, so *Monell* liability cannot attach. *See City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Quintanilla v. City of Downey*, 84 F.3d 353, 355–56 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 972, 136 L.Ed.2d 856 (1997). Moreover, the Sheriff's Department did not show "deliberate indifference" by not teaching its deputies about nonexistent dangers.

 Additionally, even if failing to administer CPR was a constitutional violation, Plaintiffs have not adduced evidence that would suggest that the deputies' omission stemmed from an official custom or policy. To the contrary, Defendant Roache testified that he hoped that his deputies would administer CPR to people in the field.[30]

---

**30.** Plaintiffs argue that this testimony created a duty to administer CPR. This assertion does not help Plaintiffs for two reasons. First, opinion testimony does not create duties; duties are imposed by law. Second, even if the sheriff's hopes or expectations could create a duty, they could not create a constitutional duty, and so would not affect Plaintiffs' § 1983 claim. At most, the

Plaintiffs thus have failed to establish *Monell* liability.

### 2. Respondeat Superior Liability

Because Plaintiffs can hold neither the deputies nor Defendant Roache liable, Plaintiffs cannot hold the county liable on a respondeat superior theory. *See* Cal. Gov't Code § 815.2; *Martinez*, 47 Cal.App.4th at 349, 54 Cal.Rptr.2d 772.

### IV. Conclusion

The events of this case are undeniably tragic. They are tragic for Price's widow. They are tragic for his young children. They are tragic for his parents. Above all, they are tragic for Price himself.

The events of this case are also tragic for the deputies. Undoubtedly, the deputies did not expect or desire Price to come to any grave harm. The Court is well aware of the distress that deaths in the field daily cause peace officers.

Plaintiffs, who had the burden of proof, ably presented a strong case with strong facts. However, as in most cases, other evidence contradicted Plaintiffs' evidence. In the end, the weight of the evidence preponderated against Plaintiffs. Plaintiffs simply did not meet their burden of proof.

In many ways, this case is symptomatic of a larger problem that has swept the San Diego area in recent years. The scourge of methamphetamine daily ravages its victims. Quite apart from the medical cause of death, which the Court discussed at length above, methamphetamine abuse precipitated this entire case. If Price had not abused methamphetamine, he would not have acted in a bizarre fashion, the deputies never would have arrived, and none of the incidents of this case would have transpired. Methamphetamine has devoured another of its victims, and forever transformed the lives of his family members.

The Court's rulings today in no way seek to downplay the tragic events of this case. In the end, the Court simply could not conclude that Defendants were the ones to blame for the unfortunate events that transpired. Accordingly, the Court must grant judgment for Defendants.[31]

IT IS SO ORDERED:

### *Appendix*

### I. Findings of Fact

1. The Court hereby incorporates by reference each and every factual recitation made in Section II of the preceding opinion.

2. Asphyxia is a decrease in blood oxygen levels or an increase in blood carbon dioxide levels.

3. Exercise does not cause blood oxygen levels to decrease.

4. The hogtie restraint impairs the mechanical process of inhaling and exhaling.

5. Despite the hogtie restraint's impairment of breathing, the hogtie restraint, in and of itself, does not affect blood oxygen or carbon dioxide levels.

6. The hogtie restraint, in and of itself, does not cause asphyxia, i.e., the hogtie restraint is inherently physiologically neutral.

7. Price's body mass index at the time of the struggle with the deputies was less than thirty. Price was not extremely obese.

8. Plaintiffs have not proven by a preponderance of the evidence that Price's girth impaired his breathing as he lay prone.

9. A deputy placed a knee in Price's back and a hand on Price's shoulder as Price was being hogtied.

10. A deputy may have maintained pressure on Price's torso for a few seconds after the hogtie was applied.

11. Deputy Tally knelt next to Price after the hogtie was applied, bringing most of his weight to bear on his heels. Deputy Tally applied only minor pressure to Price for the sake of calming him and

---

duty would sound in tort, and so would apply only to Plaintiffs' state-law claims. The state-law claims that arise from the failure to provide CPR fell not on grounds of duty, but on grounds of causation.

**31.** At the close of Plaintiffs' evidence, Defendants filed a Motion for Judgment on Partial Findings. That Motion is denied as moot.

conveying a sense of control in a tense, confused situation.

12. A deputy did not sit on Price.

13. Plaintiffs have not established that a deputy or deputies applied more than the above-described pressure to Price's torso.

14. Plaintiffs have not established what amount of pressure on a person's torso is sufficient to impair breathing or affect blood gas levels.

15. Plaintiffs have not established that pressure on Price's torso impaired his breathing, affected his blood gas levels, or in any way contributed to Price's death.

16. Price had methamphetamine in his system at the time of the autopsy.

17. Methamphetamine can irritate the heart.

18. Price had "internal derangements" in his heart that methamphetamine may have caused.

19. Price had catecholamines (adrenalin) in his system at the time of the autopsy.

20. Catecholamines can irritate the heart.

21. Price had been acting in a bizarre fashion shortly before his contact with the deputies.

22. Price developed a high fever while in the hospital, which methamphetamine abuse could have caused.

23. Price developed rhabdomyloysis in the hospital, which could have been caused by methamphetamine abuse.

24. Price most likely had a cardiac arrest during his encounter with the deputies. This preceded his pulmonary arrest. Hogtying does not lead to cardiac arrests.

25. Methamphetamine abuse was a cause of Mr. Price's death.

26. After being restrained by the deputies, Price repeatedly smashed his face into the ground.

27. A deputy placed his foot against Price's head for the purpose of preventing Price from smashing his face into the ground.

28. A deputy placed a kleenex box under Price's face in order to protect him from self-inflicted injuries.

29. The asphalt temperature on the day, time and place in question was approximately 133.9 degrees Fahrenheit.

30. Price did not suffer burns from lying on the asphalt.

31. Some of the deputies were tired on account of the struggle with Price.

32. A failure to render CPR does not involve a touching or an apprehension of a touching.

33. People suffering from a cardiac arrest due to methamphetamine-induced toxic delirium usually are not resuscitated.

34. When CPR is administered properly and promptly, neurologically intact survival from cardiac arrest is approximately two percent.

35. The failure to render CPR did not contribute to Price's death.

36. Defendant Roache did not direct, participate in, or know of any constitutional injury that may have been inflicted on Price by the deputies. Similarly, Plaintiffs have not established that Defendant Roache knew of previous constitutional violations that were similar to any violation that may have occurred in this case.

37. Prior to Price's death, Defendant Roache had information that suggested that hogtying is dangerous. Defendant Roache did not provide training to his deputies based on this information.

## II. Conclusions of Law

1. All claims that law enforcement officers have used excessive force in the course of an arrest must be analyzed under the Fourth Amendment and its "reasonableness" standard.

2. Under the Fourth Amendment, peace officers must use only an amount of force that is reasonable in light of all the surrounding circumstances.

3. In assessing the level of permissible force, courts must give due regard to the fact that peace officers frequently make

split-second judgments about the amount of force to use, without the benefit of hindsight.

4. The deputies did not use excessive force prior to the moment of the hogtie.

5. Applying the hogtie restraint to an individual who is violently resisting arrest is not, in and of itself, excessive force.

6. The deputies did not use excessive force by hogtying Price in a prone position.

7. The deputies did not use excessive force by placing a knee in Price's back and a hand on his shoulder as Price was being hogtied.

8. The deputies did not use excessive force by applying incidental pressure to Price's torso after the hogtie restraint was applied.

10. Deputy Tally did not use excessive force by kneeling next to Price and applying minor pressure to his torso.

11. The deputies did not use excessive force by placing a foot against Price's head.

12. The deputies did not use excessive force by leaving Price lying on the asphalt.

13. Aside from the failure to provide CPR, all the actions of the deputies, taken together, did not constitute excessive force.

14. In order for the deputies to be stripped of qualified immunity with respect to Plaintiffs' excessive force claim that they should have administered CPR, there must have been a clearly established constitutional duty to administer CPR.

15. If a constitutional duty exists that would require peace officers to administer CPR, that duty is not clearly established.

16. With respect to Plaintiffs' Fourth Amendment claim that the deputies should have administered CPR, the deputies are entitled to qualified immunity.

17. California Government Code section 820.2 provides immunity to the deputies from Plaintiffs' assault, battery and wrongful death claims, insofar as those claims do not stem from a failure to administer CPR.

18. A battery involves a touching.

19. An assault involves an apprehension of a touching.

20. In order to establish their wrongful death claim, Plaintiffs must prove that an action of the deputies caused Price's death.

21. To hold Defendant Roache liable for the constitutional wrongs of his subordinates, Plaintiffs must prove that Defendant Roache either participated in or directed violations, or knew of violations and failed to act to prevent them.

22. A governmental officer may be held liable for damages for constitutional wrongs engendered by his failure to supervise or train his subordinates adequately. Insufficient training can form the basis for liability under 42 U.S.C. § 1983 only if the failure to train amounts to deliberate indifference to the rights of people with whom peace officers may come into contact.

23. Absent a constitutional injury, Plaintiffs cannot hold Defendant Roache liable under 42 U.S.C. § 1983.

24. Defendant Roache did not fail to train his deputies adequately regarding the dangers of hogtying, inasmuch as the dangers are largely fictitious.

25. Defendant Roache cannot be held liable for being deliberately indifferent to a fictitious risk.

26. To establish a negligence claim against Defendant Roache, Plaintiffs must prove that he acted unreasonably and that his unreasonable behavior caused Plaintiffs' harm.

27. Defendant Roache did not act unreasonably by failing to train his deputies about the alleged dangers of hogtying, inasmuch as the dangers are largely fictitious.

28. To hold the county liable for constitutional wrongs inflicted by its deputies, Plaintiffs must prove that the county had a policy or custom that exhibited deliberate indifference to the rights of people with whom the deputies could come into contact, and that the policy was the moving force behind the constitutional violation in question.

29. Absent a constitutional injury, Plaintiffs cannot hold the county liable under 42 U.S.C. § 1983.

30. The county did not show deliberate indifference to Price's rights by not teaching its deputies about the dangers of hogtying, inasmuch as the dangers are largely fictitious.

29. The county did not have a custom or policy that would tend to cause its deputies not to administer CPR.

30. If Plaintiffs cannot hold the county's agents liable, it cannot hold the county liable under the doctrine of respondeat superior.