# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2771

_____

Duy Ngo,                                          *
                                                  *
       Plaintiff - Appellee,          *
                                                  *
  v.                                          *
                                                  *
Charles Storlie, in his individual                *
capacity as an officer of the                     *
Minneapolis Police Department,                    *   Appeal from the United States
                                                  *   District Court for District of
       Defendant - Appellant,         *   Minnesota.
                                                  *
John Doe, in his supervisory capacity             *
as ranking Minneapolis Police Officer;            *
Richard Roe, in his supervisory capacity          *
as ranking Minneapolis Police Officer;            *
City of Minneapolis, Minnesota,                   *
                                                  *
       Defendants.                    *

_____

Submitted: January 12, 2007
Filed: July 26, 2007

_____

Before WOLLMAN and MELLOY, Circuit Judges, and NANGLE, District
    Judge.[1]

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern
District of Missouri, sitting by designation.

MELLOY, Circuit Judge.

Former Minneapolis Police Officer Duy Ngo brought this action under 42 U.S.C. § 1983 against Charles Storlie, an officer with the Minneapolis Police Department ("MPD"), as well as the City of Minneapolis and two unnamed MPD supervisors (collectively, "the City"). Ngo alleged that Storlie used excessive force in violation of Ngo's Fourth Amendment rights during an incident in which Storlie shot Ngo with an MP5 semi-automatic machine gun while Ngo was working as an undercover police officer. Ngo also brought failure to train and unconstitutional custom claims against the City. The City moved for summary judgment, and the district court[2] granted the City's motion. Ngo does not appeal the grant of summary judgment to the City. Storlie also moved for summary judgment, arguing that qualified immunity applied. The district court denied Storlie's motion, and Storlie appeals. In response, Ngo filed a motion to dismiss Storlie's interlocutory appeal based on lack of jurisdiction. For the following reasons, we deny Ngo's motion to dismiss, and we affirm the district court's denial of Storlie's motion for summary judgment on the issue of qualified immunity.

I.      Background

For purposes of summary judgment, we view the evidence in the light most favorable to Ngo, the non-moving party. Scott v. Harris, 127 S. Ct. 1769, 1774 (2007); Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006). Storlie does not dispute Ngo's version of the facts for purposes of summary judgment.

---

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

In the early morning hours of February 25, 2003, Ngo was conducting plainclothes surveillance for the Minnesota Gang Strike Force ("Strike Force") in Minneapolis. Ngo was driving an unmarked green Buick. He was wearing a black hooded sweatshirt with a zip-up front, light blue jeans, brown boots, and a wig. Under his sweatshirt, Ngo was wearing a bullet-proof police vest with his police badge and portable microphone attached. Ngo's vest had "POLICE" written on the front and back. His badge was on the upper-left side of his vest.

At 12:59 a.m., Ngo called the MPD dispatcher and told the dispatcher that he was going to be working in the vicinity of East 36th Street and 3rd Avenue South. The police dispatcher sent out a text message to all squad cars, stating: "GANG 115 DOING SURVEILLANCE IN GRN BUICK. AREA OF 36 ST/3 AV. S. WILL CALL CH. 1 WHEN DONE." Metro Gang 115 was Ngo's Strike Force call number.

Approximately one hour later, Ngo was parked in an alley north of 36th Street between Clinton Avenue and 3rd Avenue. The driver's side window was open. Ngo saw the figure of a person, identified as a black male over six feet tall, appear in his rearview mirror walking southbound toward the rear of Ngo's car. The man walked up to the driver's side of Ngo's car and asked Ngo what he wanted. Ngo told him to "Get the fuck out of here." The man then produced a pistol and pointed it in Ngo's face. Ngo attempted to wrestle it away. During the struggle, the man shot Ngo in the left abdomen, but the bullet was stopped by the bullet-proof vest. The man fired several more times, putting four bullet holes through the passenger door. The man then pulled away and took off running southbound across 36th Street into the next alley. Ngo rolled out of his car, ripped open his hooded sweatshirt, and pulled it down from his shoulders. Ngo's sweatshirt was completely off his shoulders.

At this point, Ngo sent out a broadcast stating, "Metro Gang 115, Emergency. Officer shot 36th and 36th and 3rd. Suspect running south, southbound in the alley." An alert tone sounded for a citywide broadcast and the dispatcher broadcasted "All

cars officer needs help 36th and 3rd. Officer down. All cars officer detail 36th and 3rd come to channel one."

As he was broadcasting, Ngo took a 9 millimeter Beretta pistol out of the holster on his right hip. He began running after the suspect and repeatedly fired at him. Mid-block in the alley between 36th and 37th Streets, the suspect turned and ran eastbound between two houses. Ngo then drew a second pistol, a laser-sighted 9 millimeter Beretta. He held the first pistol in his right hand and the second in his left hand. At this time, still standing mid-block in the alley between 36th and 37th Streets, Ngo made a second broadcast, "Metro Gang 115 the suspect cut eastbound, black male, black male, black jacket, be advised I'm plainclothes. Black male, black jacket, white tennis shoes." Ngo then dropped his radio microphone and "let it hang." For purposes of this appeal, Storlie acknowledges receiving the dispatcher's text message, the dispatcher's citywide broadcast, and both of Ngo's radio transmissions in their entirety.

Ngo came out of the alley onto the southernmost lane of 36th Street, where he saw a squad car coming eastbound on 36th Street. Ngo was directly under a street lamp. With a pistol still in each hand, he waved his arms over his head, attempting to flag down the squad car. The squad car passed within three or four feet of Ngo, but did not see him and drove past.

Meanwhile, after hearing the radio transmissions, Storlie and fellow officer James Conway activated their squad car's siren and headed toward the area detailed in the transmission. Conway, who was driving, headed north on Highway 35W at a speed of approximately 100 m.p.h. He exited the highway at 36th Street. While Conway drove, Storlie loaded an MP5 semi-automatic machine gun before arriving at the scene. When the squad car exited the highway, the siren and lights were shut off. Conway then drove eastbound on 36th Street, which is an eastbound one-way street.

-4-

After failing to attract the attention of the first squad car, Ngo felt an intense pain in his abdomen. He dropped the pistol he had been holding in his left hand, and it fell behind him to his left. He kept the other pistol in his right hand. Ngo then fell to his knees. While on his knees, and with the pistol still in his right hand, Ngo began waving his arms over his head in an attempt to flag down the next squad car he saw. Storlie and Conway were in this car. Ngo continued to wave his arms over his head, with a pistol in his right hand, until "right before they stopped."

About mid-block between Second and Third Avenues, Conway first observed an individual just out of the alley in the southernmost lane of 36th Street. Before stopping the car, Conway said, "There he is." Conway stopped the squad car approximately nine to twelve feet from Ngo. "Almost immediately" after Ngo got the attention of the officers in the squad car, he fell forward from his kneeling position. As he fell forward, he dropped the pistol he had been holding in his right hand on the ground. His left hand never touched the ground. At that point, Ngo's right hand was on the blacktop near the pistol and his left hand was clutching his left side where he had been shot by the suspect. From the moment Ngo saw the car until the time he was shot, Ngo never attempted to stand up. His radio microphone was hanging out through the front of his unzipped hooded sweatshirt. While he had pulled his sweatshirt down off his shoulders, it is unclear whether the officers could see the "POLICE" written on the front of his bullet-proof vest or the police badge that was attached to his vest. Ngo fell forward and dropped the pistol that was in his right hand "pretty much simultaneously" with the stopping of Conway and Storlie's squad car. Ngo's head was up and he was looking at the officers.

After the squad car came to a stop, both Conway and Storlie exited the squad car and Storlie fired his MP5 semi-automatic machine gun at Ngo a split-second later. Ngo did not have enough time to say anything. Ngo was hit several times, through his left side, arm, groin, and leg area. Ngo suffered six independent gunshot wounds related to shots fired by Storlie.

Following the incident, Ngo commenced this action for damages under 42 U.S.C. § 1983 against Storlie and the City, alleging that: (1) Ngo's Fourth Amendment rights were violated by Storlie's use of deadly force in such circumstances; (2) the City failed to provide training on identifying plainclothes officers in the field; and (3) the City's custom or practice of allowing officers to use excessive force was unconstitutional. Storlie and the City both moved for summary judgment.

The district court granted the City's motion for summary judgment on Ngo's failure to train and unconstitutional custom claims. However, after looking at the evidence in the light most favorable to Ngo, the district court concluded that Storlie was not entitled to summary judgment on the basis of qualified immunity. Storlie then filed this interlocutory appeal, asserting that he is entitled to qualified immunity because he did not violate Ngo's constitutional rights, and, even if Ngo's constitutional rights were violated, Storlie's actions were objectively reasonable in light of clearly established law.

Ngo filed a motion to dismiss Storlie's interlocutory appeal, which we consider here along with the merits.

II.    Analysis

A.    Motion to Dismiss

"A denial of summary judgment based on qualified immunity is immediately appealable to the extent the appellant seeks review of the purely legal determinations made by the district court." Henderson, 439 F.3d at 501. "We have jurisdiction to review whether an official is entitled to immunity to the extent the question turns on an issue of law, but we may not review a district court's conclusion that the pretrial record presents a sufficient factual dispute requiring a trial." Craighead v. Lee, 399

-6-

F.3d 954, 960 (8th Cir. 2005). Storlie accepts all of Ngo's alleged facts as true for purposes of summary judgment. Therefore, we have jurisdiction to review the legal issues of whether Ngo's constitutional rights were violated and whether those rights were clearly established. We deny Ngo's motion to dismiss.

### B. Motion for Summary Judgment

We review de novo the district court's denial of a motion for summary judgment on the issue of qualified immunity. Henderson, 439 F.3d at 501. We will affirm a denial of summary judgment on the issue of qualified immunity "if a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful." Craighead, 399 F.3d at 960-61.

The threshold question we ask in resolving whether an officer is entitled to qualified immunity is whether the facts alleged, taken in the light most favorable to the injured party, show that the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Then, if we find a violation of a constitutional right, we determine whether the constitutional right was clearly established. Id. "This second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006) (internal quotations omitted). The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

Ngo claims Storlie violated his Fourth Amendment right to be free from excessive force. We analyze this claim under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). In doing so, we ask "whether the amount of force used was objectively reasonable under the particular circumstances." Henderson, 439 F.3d at 502 (internal quotation omitted).

-7-

In assessing the reasonableness of the officer's conduct, we look at the totality of the circumstances, Tennessee v. Garner, 471 U.S. 1, 8-9 (1985), focusing on factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. We examine the reasonableness of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

We agree with the district court that Ngo presented sufficient evidence in support of his claim to allow a reasonable jury to find the degree of force used against him was not "objectively reasonable." Before arriving at the scene, Storlie received a text message that an undercover Strike Force member was doing surveillance in the area of 36th Street and Third Avenue. An hour later, Storlie heard Ngo say, "Metro Gang 115, Emergency. Officer shot 36th and 36th and 3rd. Suspect running south, southbound in the alley." Storlie then heard a citywide alert tone and heard the dispatcher say, "All cars officer needs help 36th and 3rd. Officer down. All cars officer detail 36th and 3rd come to channel one." A few moments later, Storlie heard Ngo say, "Metro Gang 115 the suspect cut eastbound, black male, black male, black jacket, be advised I'm plainclothes. Black male, black jacket, white tennis shoes." Thus, a reasonable officer arriving at the scene would have known there was a plainclothes officer near the scene of the shooting. A reasonable officer would also know that the suspect was an African-American male in black clothing with white shoes.

Upon arriving at the scene, a reasonable officer would have seen Ngo, an Asian-American man, kneeling in the street, directly under a stop light, waving his arms above his head. There was a pistol in his right hand. Ngo's black hooded sweatshirt was pulled down off his shoulders, partially revealing his bullet-proof vest. A microphone hung down from the vest. As the squad car stopped, the reasonable officer would have seen Ngo fall forward, dropping the pistol on the ground near his

right hand. His left hand clutched his chest. His head was up and he was looking directly at the squad car. There was no one besides Ngo and the responding officers in the vicinity.

The totality of the circumstances show that Storlie's actions were not objectively reasonable. First, even though Storlie was responding to a severe crime—a fellow officer had been shot—a reasonable officer arriving at the scene would have recognized that Ngo did not pose an immediate threat to the officers' safety or the safety of others. Ngo had dropped his weapon. He was not pointing a pistol at the officers, nor was he reaching for one. Further, Ngo was not actively resisting arrest or attempting to evade such arrest by flight. As Storlie and Conway spotted Ngo, he was kneeling in the street under a street light by himself, waving his arms above his head and trying to attract the attention of the squad car. Once the squad car stopped, Ngo fell to his hands and knees, looking up at the officers.

Additionally, Storlie did not attempt to give Ngo any commands or warnings before firing at Ngo. Storlie exited the squad car and immediately opened fire on Ngo, despite the fact that he knew that there was or had been a plainclothes police officer near the scene of the shooting and despite the fact that Ngo did not match the description of the suspect. A warning under these circumstances was feasible and the failure to take an extra moment to assess the situation adds to the unreasonabless of Storlie's actions under the circumstances.

Storlie cites several cases in which we granted qualified immunity to officers who shot unarmed suspects. We find these cases to be distinguishable. Unlike the suspects in these cases, Ngo was not fleeing the scene, officers did not give Ngo any warnings to keep his hands where the officers could see them, to stop resisting, or to drop a weapon, and Ngo made no move toward a weapon or what would appear to be a weapon. Cf. Seiner v. Drenon, 304 F.3d 810, 811 (8th Cir. 2002) (stating that the officer "repeatedly ordered [the suspect] to show his hands" and to drop whatever was

in his hands); <u>Billingsley v. City of Omaha</u>, 227 F.3d 990, 992 (8th Cir. 2002) (stating that the suspect ran from the officer after being told three times to "halt," and that the suspect "moved his arms as though reaching for a weapon at waist level"); <u>Thompson v. Hubbard</u>, 257 F.3d 896, 898 (8th Cir. 2001) (stating that the suspect and the officer were involved in "[a] foot chase," that the suspect "moved his arms as though reaching for a weapon," and that the officer yelled "'stop' when [the suspect's] arms continued to move); <u>Krueger v. Fuhr</u>, 991 F.2d 435, 437 (8th Cir. 1993) (stating that the officer ordered the suspect to "freeze" several times during a chase and that the officer saw the suspect "reach to the area of his right hip," to pull out a knife). Ngo was alone in the street on his knees, and he was actively disarming as the squad car stopped. It is true that "[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force." <u>Thompson</u>, 257 F.3d at 899. However, it is clear from <u>Thompson</u> that this rule applies when an officer is trying to "protect himself against a fleeing suspect" who is armed or reaching for what appears to be a weapon. <u>Id.</u> Looking at the situation in the totality of the circumstances, it was objectively unreasonable for Storlie to shoot Ngo with a semi-automatic machine gun a split-second after arriving at the scene. A reasonable jury could conclude that Storlie's use of excessive force resulted in a violation of Ngo's Fourth Amendment right to be free from an unreasonable seizure.

The second inquiry is more difficult. Here, we must ask whether Ngo's right to be free from excessive force is clearly established. To do this, we determine whether "a reasonable officer would understand" Storlie's conduct in this situation to violate Ngo's right to be free from excessive force. <u>Henderson</u>, 439 F.3d at 503. Storlie must demonstrate that he "'acted reasonably under settled law in the circumstances.'" <u>Henderson</u>, 439 F.3d at 503 (quoting <u>Cross v. City of Des Moines</u>, 965 F.2d 629, 632 (8th Cir. 1992)). In other words, if Storlie made a reasonable mistake as to the legality of his actions in the factual situation he confronted, he "is entitled to the immunity defense." <u>Saucier</u>, 533 U.S. at 205.

-10-

"The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." Samuelson, 455 F.3d at 877 (internal quotation and alteration omitted). The use of deadly force is justified, however, "where the totality of the circumstances give the officer probable cause to believe that a fleeing suspect poses a threat of serious physical harm to the officer or to others." Thompson, 257 F.3d at 899; see Garner, 471 U.S. at 11-12 ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.").

Applying these principles, we agree with the district court that genuine issues of material fact exist as to whether a reasonable officer faced with these circumstances would have believed that his conduct was legal. Storlie exited his squad car and opened fire with a semi-automatic machine gun on a kneeling, unarmed man. He fired within a "split-second" of exiting the squad car, without giving any warnings or attempting to determine whether Ngo was, in fact, the suspect described on the radio transmission. Further, Storlie knew there was a plainclothes officer somewhere in the area. Thus, it was unreasonable for Storlie to fire on the first person he saw without first making the determination of who that person was.

Again, Storlie cites several cases for the proposition that his actions were objectively legally reasonable. Storlie, however, ignores the fact that these cases involve either a violent struggle between the officer and the suspect, or a perception by the officer that the suspect is reaching for a weapon. See Parks v. Pomeroy, 387 F.3d 949, 957-58 (8th Cir. 2004) (describing "the physical struggle" between the officer and the suspect as "hostile and intense"); Willingham v. Loughnan, 321 F.3d 1299, 1304 (11th Cir. 2003) (stating that the suspect had "attempted to kill one officer and assaulted another" before being shot); Anderson v. Russell, 247 F.3d 125, 128 (4th Cir. 2001) (stating that officers shot the suspect after the suspect lowered his

hands to his back left pocket after officers had instructed him to raise his hands and get down on his knees); <u>Sigman v. Town of Chapel Hill</u>, 161 F.3d 782, 785 (4th Cir. 1998) (describing the suspect, who was in a stand-off with officers, as "highly volatile," and "enraged"). Ngo was not a threat to the officers or anyone else at the time Storlie shot him. A reasonable officer would have known that using deadly force against Ngo, who did not "present an immediate threat of serious physical injury or death" would violate Ngo's constitutional rights. <u>See</u> <u>Craighead</u>, 399 F.3d at 962; <u>id.</u> at 962-63 (collecting cases that "put officers on notice . . . that they may not use deadly force under circumstances in which they should know that the suspect does not present an immediate threat of serious physical injury or harm"). The district court properly denied Storlie's motion for summary judgment on the basis of qualified immunity.

III.    Conclusion

For the foregoing reasons, we deny Ngo's motion to dismiss and we affirm the District Court's denial of summary judgment based on qualified immunity.

_____