# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2448

_____

|  |  |  |
|---|---|---|
| Eddie Howard, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Kansas City Police Department; | * | |
| Michael Galley, Police Officer; Board | * | |
| of Police Commissioners, Through its | * | |
| members; Angela Wasson-Hunt, in her | * | |
| official capacity as a member of the | * | |
| Board of Police Commissioners of | * | |
| Kansas City, Missouri; Karl Zobrist, in | * | |
| his official capacity as a member of the | * | |
| Board of Police Commissioners of | * | |
| Kansas City, Missouri; James Wilson, | * | |
| in his official capacity as a member of | * | |
| the Board of Police Commissioners of | * | |
| Kansas City, Missouri; Terry Brady, in | * | |
| his official capacity as a member of the | * | |
| Board of Police Commissioners of | * | |
| Kansas City, Missouri; Mayor Kay | * | |
| Barnes, in his official capacity as a | * | |
| member of the Board of Police | * | |
| Commissioners of Kansas City, | * | |
| Missouri, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Ryan Bronner, Police Officer; Mike | * | |
| Sartain, Police Officer, | * | |
| | * | |
| Defendants-Appellants. | * | |

_____

Submitted: January 16, 2009
Filed: July 2, 2009
_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.
_____

BYE, Circuit Judge.

Kansas City, Missouri, police officers Ryan Bronner and Mike Sartain (collectively, the "Officers") filed an interlocutory appeal from a district court[1] order denying their motion for summary judgment on Eddie Howard's claim of excessive force on the basis of qualified immunity. We affirm.

I

Viewing the alleged facts in the light most favorable to Howard, this lawsuit arises from the following events.[2] On July 27, 2002, the temperature in Kansas City, Missouri, exceeded 100 degrees Fahrenheit, and local weather forecasters had issued a heat advisory. At approximately 4:45 p.m., Howard, who was sitting in his red Chevrolet Camaro, was shot in his upper left arm by someone in a green Mitsubishi Mirage. Howard drove away at a high rate of speed, and the assailants gave chase. Soon thereafter, Howard saw a police cruiser and attempted to get its attention by honking and swerving his vehicle. Police officer Michael Galley observed the chase, activated his emergency lights, and pursued the speeding vehicles.

_____

[1] The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

[2] See McLean v. Gordon, 548 F.3d 613, 616 (8th Cir. 2008) (construing the facts in the light most favorable to the non-moving party on review of a denial of summary judgment on the basis of qualified immunity).

-2-

At some point during the car chase, Howard removed his shirt and wrapped it around his arm in an attempt to stem the flow of blood. Howard eventually decided to stop the vehicle and flee from his assailants on foot; he abandoned his vehicle, ran across a vacant lot, and climbed a fence. Howard's assailants then ceased their pursuit. After climbing the fence, Howard saw another police officer and attempted to get his attention. Other police officers, including officers Bronner and Sartain, arrived on the scene.

Officers Bronner and Sartain drew their weapons and pushed Howard, who remained shirtless, onto the asphalt street. The Officers began administering first aid and questioning Howard about who shot him. After two to three minutes, Howard began complaining that the hot asphalt was burning his exposed skin. The Officers interrupted Howard's complaints and continued to question him about his assailants. Howard continued to complain about the heat, and he asked the Officers whether he could move to a less painful spot. Specifically, he asked if he could lean on a police cruiser or if he could lay on a nearby patch of grass until an ambulance arrived. The Officers denied both requests.

As the asphalt continued to burn Howard, he began struggling to remove his exposed skin from the asphalt. In addition to his constant verbal complaints, Howard started moving his shoulders back and forth in an attempt to lift his back and arms off the asphalt. One of the Officers, however, held his arms down and restrained him against the asphalt. Howard then began moving his legs, but the other Officer grabbed hold of his legs and held them in place. After Howard was on the asphalt for seven to eight minutes, either Bronner or Sartain instructed a nearby officer to retrieve a yellow blanket from their police cruiser, and they placed the blanket underneath Howard.[3] As a result of his exposure to the asphalt, Howard suffered second-degree burns on his arms, back, shoulders, neck, and upper buttocks.

---

[3] Both Bronner and Sartain admitted in their affidavits that they sent another officer to retrieve the blanket.

Claiming they used excessive force in violation of the Fourth Amendment, Howard sued Bronner and Sartain under 42 U.S.C. § 1983.[4] Bronner and Sartain moved for summary judgment on the grounds of qualified immunity. The district court denied the Officers' motion, concluding the alleged facts state the violation of a clearly established right. This interlocutory appeal followed.

II

We have jurisdiction over this interlocutory appeal under the collateral order doctrine. Bonner v. Outlaw, 552 F.3d 673, 676 (8th Cir. 2009). We review de novo the district court's denial of summary judgment on the issue of qualified immunity. Ngo v. Storlie, 495 F.3d 597, 601-02 (8th Cir. 2007). "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006). To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation. See id. at 501-02. In Saucier v. Katz, the Supreme Court mandated us to consider these two requirements in sequential order. 533 U.S. 194, 201 (2001). That is, we were required to determine whether the facts demonstrated the violation of a constitutional or statutory right *before* determining whether that right was clearly established. See id. Recently, however, the Supreme Court abandoned this rigid sequence and allowed judges "to exercise their sound

---

[4] Howard also brought an excessive force claim against police officer Michael Galley and a failure to train claim against the Board of Police Commissioners and its individual members in their official capacities. The district court dismissed Howard's claim against Galley for failure to serve, and it granted summary judgment in favor of the Board of Police Commissioners and its individual members on his claim for failure to train. Neither of these rulings are at issue in the instant appeal.

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). In the instant case, we elect to proceed under the traditional framework and decide first whether the facts demonstrate a violation of Howard's constitutional rights before determining whether such rights were clearly established.

A

Viewing the facts in the light most favorable to Howard, we conclude the Officers used excessive force in violation of Howard's constitutional rights. We analyze excessive force claims in the context of the Fourth Amendment. Henderson, 439 F.3d at 502. "To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." Moore v. Indehar, 514 F.3d 756, 759 (8th Cir. 2008) (quoting McCoy v. City of Monticello, 342 F.3d 842, 846 (8th Cir. 2003)).

For purposes of the Fourth Amendment, a seizure occurs whenever "an officer restrains an individual's liberty through physical force or a show of authority." Id. Because the facts show the Officers pushed Howard to the ground and restrained him on the asphalt in spite of his attempts to move elsewhere, we conclude the Officers seized Howard. While the dissent is correct to note that Howard "voluntarily and willingly sought assistance" from the Officers, post at 15, it is equally true the Officers forced Howard to the ground, refused his verbal demands to be moved elsewhere, and actively resisted his physical efforts to remove himself from the burning pavement. Moreover, nowhere in the record is it clear that Howard felt free to leave the Officers' care, but was simply objecting to a specific application of force as part of his treatment. Given the rapidly evolving circumstances of the situation, it is difficult to accept the dissent's argument that a reasonable person would have viewed the seven to eight minute encounter as a series of mini-events that began as consensual, turned into a seizure, and then at some point once again became

-5-

consensual. In contrast, a reasonable person who flags down police officers, is forced to the ground by those officers, is denied his requests to move elsewhere, and has his arms and legs pinned to the ground as he tries to get up would not believe that he was at "liberty to ignore the police presence and go about his business." Florida v. Bostick, 501 U.S. 429, 437 (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)).

Because the Officers seized Howard, we must determine whether the seizure was reasonable. "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (quoting Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001)). The penultimate question is "whether the amount of force used was objectively reasonable under the particular circumstances." Ngo, 495 F.3d at 602 (quoting Henderson, 439 F.3d at 502). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Conner, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). In assessing the reasonableness of the Officers' conduct, we look at the totality of the circumstances and focus on factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id. We may also consider the result of the force. Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004). Additionally, we must judge the reasonableness of the Officers' conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and with "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

The present case is unusual because Howard was not a suspect in the traditional sense. Rather, the Officers contend, and Howard essentially concedes, they restrained him on the asphalt not with an intent to injure him, but to render medical aid. According to the Officers, they did not move Howard off the asphalt because they feared doing so could cause further injury. Nevertheless, by restraining Howard for the purpose of rendering medical aid and by actively preventing him from moving off the asphalt, the Officers seized Howard within the meaning of the Fourth Amendment. As such, "the question is whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances, without regard to their underlying intent or motivation." Id. at 397. The Supreme Court has counseled that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id.

Viewing the facts as previously described, we conclude the Officers' use of force was objectively unreasonable. Initially, the Officers were justified in drawing their weapons and forcing Howard to the ground upon arriving at the scene. The Officers were aware there was a shooting and a high-speed car chase, and, even though Howard approached them trying to get their assistance, it was necessary for the Officers to ensure their safety until they could ascertain Howard's role in the incident and determine whether he was armed.

It was the Officers' actions after forcing Howard to the ground, however, that were objectively unreasonable. Once Howard was on the ground, it was apparent to the Officers that he was a victim of an attack and not a suspect, that he was unarmed, and that he was not attempting to flee, resist, or harm the Officers. While the Officers initially acted reasonably in administering first aid, Howard soon thereafter began complaining that the asphalt was burning his exposed skin. Howard asked to await an ambulance while leaning on a police cruiser or while lying on a nearby patch of grass; the Officers denied both requests. In spite of Howard's constant complaints, it took the Officers four to six minutes before they responded and ordered someone

to retrieve a blanket, which they then placed underneath him. Moreover, not only did the Officers fail to act in response to Howard's complaints, they affirmatively resisted his attempts to move his exposed skin off the asphalt. The Officers were aware of the damage the asphalt was inflicting on Howard when he began to complain and move to free himself, and, instead of remedying the situation with reasonable dispatch, the Officers did nothing while Howard's injuries worsened. As a result, Howard received severe second-degree burns. Given Howard's persistent, specific complaints about the exposure of his exposed skin to hot asphalt on a day when the temperature exceeded 100 degrees, a reasonable officer should have recognized the danger to Howard and responded appropriately. Instead, Officers Bronner and Sartain did nothing for four to six minutes except pin Howard's arms and legs to the ground in spite of his attempts to move his exposed skin off the asphalt. On this version of the facts, we conclude the Officers' actions were not objectively reasonable.

Although the Officers did eventually respond to the danger by directing another officer to retrieve a blanket and placing the blanket underneath Howard, it was not reasonable for the Officers to wait seven to eight minutes after he was on the ground (four to six minutes after he began complaining) to do so. The blanket was available immediately, and there is no evidence the Officers were prevented from ordering another officer to retrieve it because of external factors or other responsibilities. Absent a good reason for waiting so long to remedy the situation while Howard's injuries worsened, the Officers' actions were unreasonable.[5]

_____

[5]While we agree with the dissent's assertion that the Officers were doing "something" during this time period to treat Howard's gunshot wound, post at 21, the relevant point is that they did "nothing" to respond to Howard's complaints of pain caused by the hot asphalt. There is no evidence to suggest that because the Officers were administering first aid to Howard, they were prevented from simultaneously dispatching another officer to retrieve a blanket. Thus, it was unreasonable for the Officers to wait four to six minutes before directing another officer to retrieve said blanket when they could have just as easily done so immediately. Therefore, the Officers were not faced with a conflict between treating Howard's gunshot wound and responding to Howard's complaints of pain; they could have easily accomplished

The Officers contend they acted reasonably because they were trained in most circumstances not to move people who are injured and bleeding, and they did not move Howard because they feared doing so could risk further injury. The Officers' justification, however, is unpersuasive. Their concern about moving Howard is a red herring because the Officers eventually placed a blanket underneath him; thus, the Officers must not have been concerned about the small amount of movement necessary to do so. While such a concern may have reasonably motivated their decision to prevent him from leaning on a police cruiser or moving to a nearby patch of grass, it does not explain why Bronner and Sartain waited four to six minutes after he began complaining before directing another officer to obtain a blanket. Thus, their delay in doing so was not objectively reasonable.[6] As such, the Officers violated Howard's Fourth Amendment right to be free from excessive force when they seized Howard.

B

We also agree with the district court that the constitutional violation was clearly established. To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Lindsey v. City of Orrick, 491 F.3d 892, 902 (8th Cir. 2007). "The question is whether the law gave the officials 'fair warning that their alleged conduct was unconstitutional.'" Bonner, 552 F.3d at 679 (quoting Brown v. Fortner, 518 F.3d 552, 561 (8th Cir. 2008)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730,

_____

both, and it was unreasonable for them to fail to do so.

[6]Contrary to the dissent's assertion, we are not "construct[ing]" a constitutional violation. Post at 19. We are affirming based on the district court's own theory of the case. See J.A. at 213-14 ("A question remains whether, in view of the circumstances present in this case, the amount of force used by Officers Bronner and Sartain in holding plaintiff down on the hot pavement for some minutes before placing a blanket under him was objectively reasonable.")

741 (2002). The "salient question" is whether the law in 2002 gave the officers fair warning that their alleged treatment of Howard was unconstitutional. Id.

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." Mann, 497 F.3d at 825 (quoting Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998)). We have already concluded the Officers used excessive force in seizing Howard because they acted unreasonably in responding to the dangers posed by the hot asphalt. We similarly conclude a reasonable official would understand that such conduct constitutes excessive force. "The key distinction between [the reasonableness inquiry and the one made under the first step of the qualified immunity analysis] is that the right allegedly violated must be defined at the appropriate level of specificity before a court can determine it was clearly established." Moore, 514 F.3d at 763 (quoting Craighead v. Lee, 399 F.3d 954, 962 (8th Cir. 2005)) (alteration in original).

Defining the right at the appropriate level of specificity, the Officers had fair warning that their alleged conduct was not objectively reasonable, and thus unconstitutional. As of 2002, it was clearly established that the Fourth Amendment was violated if an officer unreasonably ignored the complaints of a seized person that the force applied by the officer was causing more than minor injury. This proposition was established, for example, in a series of cases involving failure to respond to complaints of overly-tight handcuffs. Kopec v. Tate, 361 F.3d 772, 778 (3d Cir. 2004) (discussing clearly established law as of 2000); Heitschmidt v. City of Houston, 161 F.3d 834, 839-40 (5th Cir. 1998); Martin v. Heideman, 106 F.3d 1308, 1312 (6th Cir. 1997); Alexander v. County of Los Angeles, 64 F.3d 1315, 1322-23 (9th Cir. 1995); Palmer v. Sanderson, 9 F.3d 1433, 4136 (9th Cir. 1993); cf. Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005) (discussing excessive force claim arising in 2000). In this case, the Officers were expressly made aware, by Howard's persistent complaints and efforts to move his arms and back off the asphalt, of the harm that the hot asphalt was inflicting on Howard. As such, it was clear to a reasonable officer that doing nothing for four to six minutes—and in fact making the situation worse by pinning

Howard's arms and back to the asphalt—without a good reason was unlawful in the situation Officers Bronner and Sartain confronted.

The dissent is incorrect to conclude that just because prior cases do not set forth a fixed period of time beyond which it is unreasonable to ignore a seized person's complaints of pain, the constitutional violation in this case was not clearly established. Post at 25. As noted, cases clearly establish that it is unreasonable to ignore a person's complaints of pain resulting from an officer's use of force. Because the Officers in this case ignored, i.e., did not reasonably respond to, Howard's complaints of pain, the unlawfulness of their actions was apparent. We need not define at precisely what moment their delay became unconstitutional, only that waiting four to six minutes, without justification, before responding was tantamount to ignoring Howard's complaints.[7] Because case law clearly establishes that is a Fourth Amendment violation to unreasonably ignore a seized person's complaints of pain, the unlawfulness of the Officers' actions was apparent.

Moreover, the only excessive force case in existence at the time of the incident dealing with the dangers of hot asphalt on exposed skin found for the police officers only after finding several mitigating factors not present in this case. See Price v. County of San Diego, 990 F. Supp. 1230 (S.D. Cal. 1998). In Price, police officers wrestled with a large suspect, hogtied him, and left him lying shirtless on hot asphalt. Id. at 1234-36. The suspect eventually died. Id. at 1236. Addressing the claim of excessive force with respect to leaving the suspect shirtless on hot asphalt, the court

---

[7]The dissent makes much of facts that are not before the court. Had the Officers immediately directed someone to find a blanket, but it took several minutes for that person to retrieve the blanket, then it could not fairly be said that the Officers ignored Howard's complaints. Post at 25. Likewise, had circumstances been such that the Officers could not have retrieved the blanket because of other responsibilities (e.g., the Officers would have had to interrupt treatment to retrieve the blanket, and it would be reasonable to conclude the interruption in treatment would pose a greater threat than the hot asphalt), then they would have a good reason for delaying, and we would not say the Officers ignored Howard's complaints.

-11-

found the officers acted reasonably for several reasons: (1) the deputies were tired after struggling with the suspect, which would have made it difficult to move a hefty and belligerent person; (2) the officers had to perform other tasks, such as calling for medical assistance and controlling onlookers; and (3) the suspect did not suffer any burns, which indicates the asphalt temperature was not so high that it was unreasonable to leave him lying there for a short period of time. Id. at 1241.

In this case, however, there is no evidence the Officers were unable to prevent the injuries caused by the hot asphalt; in fact, by placing a blanket underneath Howard the Officers demonstrate how easy and readily available such a solution was. Additionally, there is no evidence the Officers were reasonably prevented from directing another officer to retrieve the blanket because of other necessary responsibilities. Finally, Howard suffered severe second-degree burns. Because none of the mitigating factors present in Price were involved in this case, the Officers had fair warning that their use of force was not objectively reasonable. As such, the Officers' conduct violated a clearly established right.[8]

### III

Accordingly, we affirm the district court.

---

[8]We reiterate that our holding is premised on the stark factual scenario posited by Howard and the district court. In contrast, the Officers have averred that they dispatched an officer to retrieve the blanket after Howard complained about the hot pavement, and that Howard spent no more than a few minutes (as opposed to seven or eight minutes) on the pavement before he was moved to the blanket. If these facts are accepted, then the conduct of the Officers was objectively reasonable and consistent with the Fourth Amendment. At this stage of the proceedings, however, we must accept Howard's contrary version of events, and we resolve the issue of qualified immunity on that basis.

GRUENDER, Circuit Judge, dissenting.

This appeal presents the question whether Officers Ryan Bronner and Mike Sartain are entitled to qualified immunity on Eddie Howard's claim that he was subjected to excessive force in violation of the Fourth Amendment. Because I do not agree with the Court's conclusions that Howard was seized when the alleged constitutional violation occurred, that the officers' actions were objectively unreasonable under the Fourth Amendment, and that the alleged constitutional violation was clearly established, I respectfully dissent.

## I.     Howard was not seized when the alleged constitutional violation occurred

At the outset, it is worth reiterating that an excessive force claim under the Fourth Amendment requires that the plaintiff be seized when the constitutional violation occurs. *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008). Here, the Court concludes that Howard was seized during the alleged constitutional violation because the officers had "pushed Howard to the ground and restrained him on the asphalt in spite of his attempts to move elsewhere." *Ante* at 5. The Court's analysis of the seizure issue, however, is incomplete. The Court neglects significant circumstances demonstrating that a reasonable person in Howard's position would have understood that the situation began as a consensual encounter, was momentarily converted into a seizure, and then was converted back into a consensual encounter before the alleged constitutional violation occurred. Because the totality of the circumstances shows that a reasonable person in Howard's position would have understood that he was free to refuse the officers' medical treatment and terminate the encounter, *see Florida v. Bostick*, 501 U.S. 429, 437 (1991), I would find that Howard was not seized when the alleged constitutional violation occurred.

"Not every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment." *United States v. Barry*, 394 F.3d 1070, 1074 (8th Cir. 2005). To determine whether an encounter constitutes a Fourth

Amendment seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)); *cf. California v. Hodari D.*, 499 U.S. 621, 628 (1991) (noting that satisfaction of the "reasonable person" test described in *Bostick* is "a *necessary*, but not a *sufficient*, condition for seizure"). We view the circumstances surrounding the encounter through the lens of a reasonable person in Howard's situation, informed by the objective facts known to an individual in Howard's position at that time. *See Chesternut*, 486 U.S. at 569. The seizure inquiry is necessarily imprecise and requires case-by-case evaluation, since the result hinges on the unique facts of each situation. *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008).

Here, the encounter began when Howard *voluntarily* and *willingly* sought assistance from the officers to provide protection from his pursuing assailants and medical aid for his gunshot wound. To this end, Howard first attempted to draw Officer Galley's attention by honking and swerving his red Camaro while he was being pursued by his assailants in the green Mirage, and he then flagged down Officers Bronner and Sartain for help after fleeing his parked car. *Ante* at 2-3. The fact that Howard initiated contact is significant because it is more likely that a citizen would feel free to terminate the encounter when he, and not the police, invited the encounter. *Cf. United States v. Valle Cruz*, 452 F.3d 698, 705-06 (8th Cir. 2006) (holding that an individual was not seized when she voluntarily pulled her vehicle over to wait for a traveling companion in another vehicle, which had been stopped by law enforcement); *United States v. Summers*, 268 F.3d 683, 687 (9th Cir. 2001) (holding that defendant's act of approaching the police officer supported the conclusion that the interaction was voluntary).

Although I agree with the Court that the situation was momentarily converted from a consensual encounter into a seizure because of the officers' acts of drawing

their weapons, ordering Howard to the ground, and forcing him down on the ground, *see ante* at 5, the subsequent circumstances, viewed from the objective perspective of a reasonable person in Howard's position, converted the situation back into a consensual encounter before the alleged constitutional violation occurred. *Cf. United States v. Barnum*, 564 F.3d 964, 972-73 (8th Cir. 2009) (holding that a police officer's acts converted a seizure into a consensual encounter); *United States v. Ramirez*, 476 F.3d 1231, 1240 (11th Cir. 2007) (same). As the officers laid Howard on the ground, Howard apprised the officers that he was a victim rather than a perpetrator, yelling "I just got shot; the guys was over there, they're back there." Once the officers noticed Howard's gunshot wound, they immediately holstered their weapons and began treating his injury. The officers' actions removed from the equation most of those objective circumstances—the display of weapons, the use of coercive language or intonation, and acts and language indicating the person is under investigation—that could lead a reasonable person in Howard's situation to believe that he was being seized. *See Griffith*, 533 F.3d at 983. Similarly, a reasonable person in Howard's situation would understand that the remaining circumstances that might otherwise be indicative of a seizure—the presence of several officers and physical restraint—were clearly done in the furtherance of the officers' provision of treatment to Howard. *Cf. Morelli v. Webster*, 552 F.3d 12, 20 (1st Cir. 2009) ("Hallmark factors such as physical restraint . . . may be suggestive, but in certain circumstances such factors may be perfectly consistent with an investigatory stop [instead of an unlawful detention].").

After the officers holstered their weapons and began treating Howard, they asked him questions about his assailants and radioed dispatch "to tell the cops that it's a green car and there's four dudes in the car." The officers' questions concerning Howard's assailants, when considered alongside the facts that the officers did not handcuff Howard, administer *Miranda*[9] warnings, or tell him that he was under arrest, would lead a reasonable person in Howard's situation to believe that the officers accepted Howard's claim that he was a victim and not the subject of police suspicion

---

[9]*Miranda v. Arizona*, 384 U.S. 436 (1966).

or investigation.[10] Moreover, after the officers determined that Howard was the victim and not a suspect, this encounter occurred entirely for the benefit of Howard, the citizen, rather than for the benefit of law enforcement, which typically enjoys the fruits of those encounters alleged to be seizures. *Cf. United States v. Drayton*, 536 U.S. 194, 201 (2002) (encounter benefitted police drug interdiction efforts); *INS v. Delgado*, 466 U.S. 210, 211-12 (1984) (encounter benefitted federal immigration law enforcement efforts); *Terry v. Ohio*, 392 U.S. 1, 6-7 (1968) (encounter benefitted law enforcement anti-theft efforts). Howard's status as the intended beneficiary of the encounter further increases the likelihood that a reasonable person in Howard's position would have understood that he was not being seized. *Cf. United States v. Flores-Sandoval*, 474 F.3d 1142, 1145 (8th Cir. 2007) ("A consensual encounter does not implicate the Fourth Amendment.").

I am not convinced that the officers' acts of immobilizing Howard in accordance with their first-responder training and refusing his requests to move the continuing treatment onto a nearby patch of grass or against the officers' police cruiser converted the consensual encounter back into a seizure. The Supreme Court has recognized that "not every governmental interference with an individual's freedom of movement raises such constitutional concerns that there is a seizure of the person." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 618 (1989). For instance, the Sixth Circuit has held that "a voluntarily confined individual who is bodily restrained by State actors, related to his consented-to medical treatment, has not been seized for purposes of the Fourth Amendment's application so long as a reasonable person in the patient's position would believe that he was free to leave the State's care." *Lanman v. Hinson*, 529 F.3d 673, 681 (6th Cir. 2008) (citing *Chesternut*, 486 U.S. at 573). The Sixth Circuit's reasoning in *Lanman* is instructive here. A reasonable person in

---

[10]Although it cannot factor into the objective inquiry, Howard's subjective beliefs show he understood that the situation reverted back to a consensual encounter from a seizure. According to Howard's testimony, the encounter changed from one where "[the police] probably thought that I was the bad guys" into one where "[the officers] instantly started asking questions [about the assailants in the green car]."

Howard's position, a citizen seeking and voluntarily consenting to assistance from police officers for treatment of a gunshot wound, "would believe that the restraint was part of the medical treatment he had authorized, and not an attempt by defendants to keep him there against his will."[11] *Id.* Moreover, "[w]hile the facts viewed in the light most favorable to plaintiff suggest that [Howard] did ask defendants to get off of him . . . , there is no evidence to suggest that [he] expressed a desire to leave [their treatment] and defendants refused to allow him to do so." *See id.*; *cf. United States v. Siwek*, 453 F.3d 1079, 1086 (8th Cir. 2006) (holding that an individual must make "an unequivocal act or statement" to withdraw his consent to search).[12]

Because a reasonable person in Howard's position, a law-abiding citizen who sought out police officers, would have understood that he was not under suspicion of any crime and that he was free to discontinue the treatment and leave the situation, I would find that Howard was not seized when the alleged constitutional violation occurred.

## II.    The officers' actions were objectively reasonable under the Fourth Amendment

Even assuming that the officers seized Howard, I would find that the seizure did not violate the Fourth Amendment because the officers' actions were objectively reasonable under the circumstances. In particular, I would find that it was objectively

---

[11]Indeed, Howard himself even speculated that the officers' restraint was based on a concern for his safety because "[they] didn't want me to move and hurt myself more than I was already hurt."

[12]In concluding that Howard was seized, the Court impermissibly focuses on Howard's subjective understanding of the situation rather than the understanding of an objectively reasonable person in Howard's situation. *See ante* at 6 ("[N]owhere in the record is it clear that *Howard* felt free to leave the Officers' care, but was simply objecting to a specific application of force as part of his treatment." (emphasis added)).

reasonable for the officers to spend four to six minutes attending to Howard's life-threatening gunshot wound before responding to Howard's complaints about the hot pavement, which caused injuries that were serious but not life-threatening.

The Court concedes that the officers' actions were at least partially reasonable. Initially, the Court finds that it was objectively reasonable for the officers to force Howard to the ground at gunpoint and to administer first aid in the two to three minutes before Howard started to complain about the hot pavement. *Ante* at 7-8. The Court also indicates that the officers' concern with limiting Howard's movement in order to avoid further injuries "may have reasonably motivated their decision to prevent [Howard] from leaning on a police cruiser or moving to a nearby patch of grass." *Ante* at 9. Finally, the Court suggests that "[if] Howard spent no more than a few minutes (as opposed to seven or eight minutes) on the pavement before he was moved to the blanket," then the officers' actions were "objectively reasonable and consistent with the Fourth Amendment." *Ante* at 13 n.8.

Nevertheless, the Court holds that the officers' actions were not objectively reasonable based on at least four considerations. First, Howard complained that the pavement was hot and asked to move to a different location. *Ante* at 8. Second, the officers responded to Howard's complaints four to six minutes later by "directing another officer to retrieve a blanket" from their police cruiser and placing the blanket underneath Howard's back and shoulders. *Ante* at 8. Third, the officers "did nothing" during the intervening four to six minutes "except pin Howard's arms and legs to the ground." *Ante* at 8. Fourth, the blanket was "available immediately," so the officers could have "order[ed] another officer to retrieve it" as soon as Howard started to complain, and there is no evidence that the officers had a "good reason" for waiting four to six minutes to respond to Howard's complaints. *Ante* at 8-9.

The Court's holding is premised on a theory of the alleged constitutional violation that the Court has itself constructed: basically, waiting too long to order a third officer to retrieve the blanket while "doing nothing" and without a "good

-18-

reason." As far as I can tell, Howard has never alleged that Officers Bronner and Sartain violated the Fourth Amendment in this manner. Instead, the focus of Howard's complaint and his opposition to the officers' motion for summary judgment was the officers' affirmative conduct in forcing him to the ground at gunpoint and holding him down on the hot pavement. The crux of Howard's constitutional claim was that the officers violated the Fourth Amendment by using *excessive force*, which prevented him from getting off the pavement and moving to a different location. Howard could not prevail under this excessive force theory; as the Court seems to recognize, it was objectively reasonable for the officers to immobilize Howard on the pavement in order to avoid further injuries (and, of course, to limit the loss of blood). *See ante* at 9. On its own initiative, the Court converts the alleged constitutional violation into one of omission—the officers' failure to respond to Howard's complaints "with reasonable dispatch." *Ante* at 8. The result is a glaring mismatch between the Court's theory of the alleged constitutional violation and the specific facts set out in Howard's opposition to the officers' motion for summary judgment. *Cf.* Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party . . . must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial.").

If the constitutional violation is waiting too long to order a third officer to retrieve a blanket while in the meantime "doing nothing" without a "good reason," then the plaintiff bears the burden under Rule 56(e)(2) of specifically asserting that Officers Bronner and Sartain did nothing except pin his arms and legs to the ground and had no good reason for failing to respond to his complaints with greater dispatch. In my view, Howard has not met that burden. On the contrary, Howard's version of the facts tends to show that the officers were occupied with other tasks during the four to six minutes after he initially complained about the hot pavement and that the officers had a good reason for waiting four to six minutes before ordering a third officer to retrieve the blanket. According to Howard, Officer Bronner was applying pressure to Howard's gunshot wound, Officer Sartain was restraining Howard's legs to thwart Howard's "attempts to scramble to his feet," and both officers were asking

-19-

repetitive questions with the obvious purpose of keeping Howard from slipping into unconsciousness. Thus, Howard has conceded that Officers Bronner and Sartain did something rather than nothing for the four to six minutes after he started to complain and that the officers had a good reason—treating his life-threatening gunshot wound—for waiting four to six minutes to respond to his complaints. As for the third officer who allegedly retrieved the blanket, Howard again falls short of his burden under Rule 56(e)(2) because he does not set out any specific facts about who the third officer was, when the third officer arrived on the scene, whether the third officer was occupied with other tasks before retrieving the blanket, or how long it took the third officer to locate the blanket and bring it to Officers Bronner and Sartain after being ordered to do so.

The Court's analysis of the alleged constitutional violation is flawed in two additional respects. First, the Court's analysis fails to account for the governmental interests at stake in this situation. As the Supreme Court has held, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The Court's analysis focuses exclusively on the nature and quality of the intrusion on Howard's Fourth Amendment interests without placing any countervailing governmental interest in the balance. Although the officers have not clearly articulated what interests they seek to defend, we may infer that one of the relevant interests is the interest of police in providing efficacious treatment to a person who seeks medical attention for a life-threatening injury. The interest in providing efficacious treatment necessarily implies that officers are entitled to some measure of deference in attending to the life-threatening injury before responding to comparatively less serious complaints. Placing this interest in the balance yields the conclusion that a reasonable officer could reasonably spend four to six minutes maintaining pressure on Howard's wound, restraining Howard's legs to thwart his

attempts to scramble to his feet, and asking repetitive questions to keep Howard from slipping into unconsciousness before turning to other matters.[13]

Second, the Court's analysis depends on the "20/20 vision of hindsight." *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). For example, the Court states that "by placing a blanket underneath Howard the Officers demonstrate[d] how easy and readily available such a solution was." *Ante* at 12. The Court's logic seems sound enough with the benefit of hindsight. But the Court fails to heed the Supreme Court's admonition that the Fourth Amendment inquiry must make "allowance[s] for the fact that police officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. The medical emergency that Officers Bronner and Sartain confronted was tense, uncertain, and rapidly evolving, forcing them to make immediate treatment decisions with potential life-or-death consequences. As a result, ordering a third officer to retrieve the blanket in the eighth minute of their encounter with Howard does not prove that the solution was "easy and readily available" four, five, or six minutes earlier. Not every delay in responding to a seized person's complaints—even complaints that later seem vitally

--------

[13]The Court assumes that Officers Bronner and Sartain could have continued treating Howard's life-threatening injury while "simultaneously dispatching another officer to retrieve a blanket." *Ante* at 9 n.5. To be sure, human beings generally are capable of performing more than one task at once. But the relevant question here is whether the Fourth Amendment *required* Officers Bronner and Sartain to shift part of their focus away, albeit momentarily, from maintaining pressure on Howard's wound, restraining Howard's legs to thwart his attempts to scramble to his feet, and asking repetitive questions to keep Howard from slipping into unconsciousness. Although "[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished," *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985), I do not think it was unreasonable for Officers Bronner and Sartain to spend four to six minutes working singlemindedly to save Howard's life.

important and easily redressed—violates the Fourth Amendment. *Cf. id.* at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal citation and quotation marks omitted)).

As we have previously noted, "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). I am convinced that the officers in this case were operating in a gray area. Without the benefit of 20/20 hindsight, the officers could not have predicted whether Howard would survive the gunshot wound which severed the brachial artery in his arm. Equally, the officers could not have predicted the precise extent of the harm caused by Howard's exposure to the hot pavement, though this harm was obviously not life-threatening. The officers faced a conflict between Howard's complaints, their training not to move a person with a gunshot wound, and the other tasks that occupied their time and attention during the crucial four-to-six-minute interval. Under these challenging circumstances, the officers made what was at worst a "bad guess"—that the best course of action was to take steps that would maximize Howard's chances of survival before responding to his complaints about the hot pavement. Judging this incident from the perspective of a reasonable officer on the scene, I cannot say that Officers Bronner and Sartain should be denied qualified immunity, which protects "all but the plainly incompetent or those who knowingly violate the law." *See Littrell*, 388 F.3d at 582 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## III.    The alleged constitutional violation was not clearly established

Even assuming that the officers' actions were not objectively reasonable under the circumstances, I would still find that the officers are entitled to qualified immunity because the alleged constitutional violation was not clearly established at the time of their encounter with Howard. The Court reaches a contrary conclusion by defining the alleged constitutional violation at an excessive level of generality. Namely, the

Court holds that "[a]s of 2002, it was clearly established that the Fourth Amendment was violated if an officer unreasonably ignored the complaints of a seized person that the force applied by the officer was causing more than minor injury." *Ante* at 11.  The Supreme Court has made clear that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal citation omitted).

I am not convinced that in the light of pre-existing law the unlawfulness of the officers' actions was apparent.  There is a dearth of pre-existing law concerning the use of excessive force in the course of providing treatment to a seized person who requested assistance from the police. *Cf. Hope v. Pelzer*, 536 U.S. 730, 753 (2002) (Thomas, J., dissenting) ("[I]t is crucial to look at precedent applying the relevant legal rule in similar factual circumstances.  Such cases give government officials the best indication of what conduct is unlawful in a given situation.").  Cases involving an officer's failure to respond to a suspect's complaints about tight handcuffs seem inapposite given the nature of the medical emergency that Officers Bronner and Sartain confronted.  When a suspect complains that his handcuffs are too tight, the injury can be redressed by loosening the handcuffs.[14]  Identifying the proper course of action is not so simple when a person with a life-threatening injury complains of a condition that is likely to cause injuries that are not life-threatening.  Here again,

---

[14]Even so, an officer's failure to respond to such complaints does not necessarily violate the Fourth Amendment. *See, e.g.*, *McGruder v. Heagwood*, 197 F.3d 918, 920 (8th Cir. 1999) (affirming the grant of qualified immunity to officers who ignored a suspect's complaints that his handcuffs were too tight, holding that "objectively reasonable police officers could have believed that they were not using excessive force, though this belief may have been erroneous").

without resorting to 20/20 hindsight, I would conclude that a reasonable officer could reasonably elect to focus his undivided attention on treating the life-threatening injury before responding to other complaints.

The Court does not identify any cases clearly establishing the amount of time that may elapse before an officer's failure to respond to a seized person's complaints—about tight handcuffs or any other potentially injurious condition—becomes a constitutional violation. And the Court's analysis of the alleged constitutional violation in this case provides precious little guidance to officers who might face an analogous situation in the future.

What exactly does it mean, in practice, to "remedy[] [a] situation with reasonable dispatch"? *See ante* at 8. Presumably, the clock starts running as soon as a seized person complains about a potentially injurious condition. But it would be absurd to suggest that police officers must always redress a seized person's complaints within four to six minutes. What if Howard had suffered a grand mal seizure instead of a gunshot wound, would it then be reasonable for the officers to spend four to six minutes treating his life-threatening condition without "simultaneously" responding to earlier complaints? Or what if Officers Bronner and Sartain dispatched the third officer immediately but it took more than six minutes to find the blanket, buried beneath a pile of other equipment in the back of their police cruiser? In that situation, Howard would spend at least as much time on the hot pavement as he did in this case, yet the Court indicates that the officers' conduct would no longer violate the Fourth Amendment. *See ante* at 12 n.7. This suggests that the outcome of the Court's constitutional inquiry depends more on whether the officers *intended* to redress Howard's complaints with reasonable dispatch and less on whether the officers' actual conduct was unreasonable. *Cf. Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). It seems as if the most a reasonable officer could learn from the Court's opinion is that ignoring a seized person's complaints for four to six

minutes is sometimes (often? always?) impermissible, while redressing such complaints within "a few minutes" is sometimes (often? always?) objectively reasonable. *Compare ante* at 11-12, *with ante* at 13 n.8.

In my view, the contours of the right that the officers allegedly violated were not sufficiently clear that a reasonable officer would understand that it was unlawful to spend four to six minutes attending to Howard's life-threatening gunshot wound before responding to his complaints about the hot pavement, which caused injuries that were serious but not life-threatening.

## IV. Conclusion

In summary, I would conclude that Howard was not seized when the alleged constitutional violation occurred, that the officers' actions were objectively reasonable under the Fourth Amendment, and that the alleged constitutional violation was not clearly established. Accordingly, I would reverse the district court's denial of the officers' motion for summary judgment on the issue of qualified immunity and remand with instructions to grant the motion. Because the Court concludes otherwise, I respectfully dissent.

_____